James Dean, appellee and cross-appellant, v.
State of Nebraska, appellant and cross-appellee.

Ada JoAnn Taylor, appellee, v.
State of Nebraska, appellant.

___ N.W.2d ___

Filed July 18, 2014.    Nos. S-12-974, S-12-975.

1.  **Statutes: Appeal and Error.** Statutory interpretation is a question of law, which an appellate court resolves independently of the trial court.
2.  **Tort Claims Act: Appeal and Error.** A district court's findings of fact in a proceeding under the State Tort Claims Act will not be set aside unless such findings are clearly erroneous.
3.  **Statutes: Appeal and Error.** Statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.
4.  **Statutes.** A court must attempt to give effect to all parts of a statute, and if it can be avoided, no word, clause, or sentence will be rejected as superfluous or meaningless.
5.  **Statutes: Intent.** In construing a statute, a court looks to the statutory objective to be accomplished, the evils and mischiefs sought to be remedied, and the purpose to be served. A court must then reasonably or liberally construe the statute to achieve the statute's purpose, rather than construing it in a manner that defeats the statutory purpose.
6.  **Statutes: Legislature: Intent.** The fundamental objective of statutory interpretation is to ascertain and carry out the Legislature's intent. An interpretation that is contrary to a clear legislative intent will be rejected. That which is implied in a statute is as much a part of it as that which is expressed.
7.  ____: ____: ____. An appellate court can examine an act's legislative history if a statute is ambiguous or requires interpretation.
8.  **Statutes: Immunity: Waiver.** Statutes that purport to waive the protection of sovereign immunity of the State or its subdivisions are strictly construed in favor of the sovereign and against the waiver.
9.  **Immunity: Waiver: Presumptions.** A waiver of sovereign immunity is found only where stated by the most express language of a statute or by such overwhelming implication from the text as will allow no other reasonable construction. This principle has been said to create a presumption against waiver.
10. **Statutes: Appeal and Error.** An appellate court does not consider a statute's clauses and phrases as detached and isolated expressions. Instead, the whole and every part of the statute must be considered in fixing the meaning of any of its parts.
11. **Statutes: Legislature: Intent.** When words of a particular clause, taken literally, would plainly contradict other clauses of the same statute, or lead to some manifest absurdity or to some consequences which a court sees plainly could not

have been intended, or to result manifestly against the general term, scope, and purpose of the law, then the court may apply the rules of construction to ascertain the meaning and intent of the lawgiver, and bring the whole statute into harmony if possible.

12. **Statutes: Appeal and Error.** The rules of statutory interpretation require an appellate court to give effect to the entire language of a statute, and to reconcile different provisions of the statute so they are consistent, harmonious, and sensible.

13. ____: ____. In construing a statute, an appellate court will, if possible, try to avoid a construction which would lead to absurd, unconscionable, or unjust results.

14. **Tort Claims Act: Damages: Appeal and Error.** The amount of damages awarded in a case under the State Tort Claims Act is a matter solely for the finder of fact, whose decision will not be disturbed on appeal if it is supported by evidence and bears a reasonable relationship to the elements of damages proved at trial.

15. **Statutes: Damages.** Where damages are subject to a statutory cap, the determination of damages is a two-stage process which involves an initial factual determination of the actual damages sustained by the injured party and then a legal application of the statutory cap if the actual damages exceed the statutory maximum recoverable amount.

Appeals from the District Court for Gage County: Daniel E. Bryan, Jr., Judge. Judgment in No. S-12-974 affirmed in part and in part reversed and vacated, and cause remanded with directions. Judgment in No. S-12-975 affirmed.

Jon Bruning, Attorney General, and James D. Smith for appellant.

Herbert J. Friedman, of Friedman Law Offices, P.C., L.L.O., for appellee James Dean.

Jeffry D. Patterson and Robert F. Bartle, of Bartle & Geier Law Firm, and Douglas Stratton, of Stratton, DeLay & Doele, for appellee Ada JoAnn Taylor.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

Stephan, J.

Following their pleas of guilty, James Dean and Ada JoAnn Taylor were convicted of second degree murder in connection

with the 1985 death of Helen Wilson in Beatrice, Nebraska. Both gave incriminating testimony at the trial of Joseph White who was convicted of first degree murder in connection with Wilson's death. But years later, DNA tests determined that neither Dean, Taylor, White, nor any of the other three persons convicted in connection with the crime had any involvement in it.

After they were released from prison and pardoned, Dean and Taylor brought actions against the State pursuant to the Nebraska Claims for Wrongful Conviction and Imprisonment Act[1] (the Act) which was enacted by the Nebraska Legislature in 2009.[2] The district court for Gage County found in favor of Dean and Taylor and awarded damages to each of them. In these consolidated appeals, the State contends that Dean and Taylor cannot recover under the Act, because they made false statements in connection with Wilson's murder. Dean cross-appeals, arguing that his damage award was insufficient. We affirm the judgment in favor of Taylor in its entirety and the judgment in favor of Dean with respect to the State's liability, but we reverse and vacate, and remand to the district court for a new determination of Dean's damages.

## I. BACKGROUND

### 1. Facts

The facts of this case are undisputed. Wilson was brutally raped and murdered in her Beatrice apartment in February 1985. Bruce Allen Smith, a drifter who was in Beatrice when the crime was committed, was an early suspect. However, after a comparison of Smith's blood with blood found on Wilson's clothing appeared to preclude him, the State's focus shifted elsewhere.

Dean and Taylor were swept into the investigation in the spring of 1989, after the case had gone cold. They, along with four others, gained notoriety as the "Beatrice Six." Dean

---

[1] Neb. Rev. Stat. §§ 29-4601 to 29-4608 (Cum. Supp. 2012).

[2] See 2009 Neb. Laws, L.B. 260, §§ 1 to 8.

was arrested on April 15, 1989, the day of his 25th birthday. In March 1989, authorities came to Taylor's North Carolina home at night and took her to jail in a nightgown. She was subsequently transported to Gage County a few days later.

Dean and Taylor were questioned about the murder and ultimately confessed to their involvement. Both also eventually testified at the murder trial of White, who was convicted of first degree murder for Wilson's death.

However, neither Dean nor Taylor immediately confessed. For 22 days after his arrest, Dean maintained his innocence. His confidence was shaken only after he submitted to a polygraph test and was told that the results "'did not look good.'" In addition, while in county jail, Dean received four or five visits from Dr. Wayne Price. Dr. Price was a licensed clinical psychologist who served in the dual capacity as the clinical director of the Blue Valley Mental Health Center and, unknown to Dean, a police psychologist employed by the Gage County Sheriff's Department. Dr. Price told Dean that he had "'unconscious'" knowledge of the crime and that his repressed memories would return to him in his dreams. Dean thought this theory explained his polygraph results and began purposefully using Price's techniques to recover memories.

Subsisting on 2 to 3 hours of sleep a night, Dean began to dream of Wilson's murder, believing that Price had removed "some kind of 'subconscious block.'" Prior to and during the period that Dean was purportedly recovering memories, he was shown videotape, photographs, and diagrams of the crime scene at Wilson's apartment. The photographs included personal items covered with blood and Wilson's body as it was found by law enforcement. Eventually, Dean confessed. He made six statements to law enforcement between May and September 1989, providing more detail with each additional statement. With the help of law enforcement's giving him information "in bits and pieces," Dean was eventually able to describe White's involvement in the murder.

Dean reached an agreement with the prosecution to plead guilty to second degree murder in exchange for his cooperation in the prosecution of other members of the Beatrice Six.

Dean testified at White's trial and described the various steps the six persons had taken during Wilson's murder. A jury found White guilty of first degree murder. Dean was sentenced to 10 years in prison and served approximately 5 years 5 months of his sentence.

Taylor, like Dean, initially maintained that she had no knowledge of the Wilson murder. However, when she was told shortly after arrest that there was proof of her involvement, she believed law enforcement, because "I had no reason to believe that the cops would lie to me." While held at the Gage County Detention Center, Taylor was diagnosed with "borderline personality disorder" and was administered an antipsychotic drug by Dr. Price. Because of her mental difficulties and heavy use of alcohol and drugs, Taylor doubted her own memory and asked law enforcement for "'help . . . to remember.'" Taylor received assistance from law enforcement in "remembering" the details of the crime. She eventually was able to reconstruct her supposed involvement after being "[s]upplied" with the facts of the murder, including a videotape of the crime scene. Taylor "got help from law enforcement over the course of coming up with [her] story."

Taylor reached an agreement with the prosecution to plead guilty to second degree murder in exchange for her testimony at White's trial. She was able to pepper her testimony with specific details, including that she initiated the sequence of events by knocking on the door of Wilson's apartment and that she had placed a pillow over Wilson's head during the attack. Taylor was sentenced to 40 years in prison and was incarcerated for more than 19 years.

In 2005, White filed a motion under the DNA Testing Act, Neb. Rev. Stat. §§ 29-4116 to 29-4125 (Reissue 2008), to test the genetic material left at Wilson's apartment.[3] The results of the testing implicated Smith, but none of the Beatrice Six. Dean and Taylor subsequently received pardons.

Dean and Taylor both maintain that they believed they were telling the truth when they made their statements to law

---

[3] *State v. White*, 274 Neb. 419, 740 N.W.2d 801 (2007).

enforcement, pled guilty to second degree murder, and testified at White's trial.

### 2. Procedural Background

On February 22, 2010, Dean and Taylor filed complaints in the Gage County District Court, stating claims for relief under the Act. The prerequisites for recovery are set forth in § 29-4603, which states that to prevail, a claimant must, by clear and convincing evidence, prove:

> (1) That he or she was convicted of one or more felony crimes and subsequently sentenced to a term of imprisonment for such felony crime or crimes and has served all or any part of the sentence;

> (2) With respect to the crime or crimes under subdivision (1) of this section, that the Board of Pardons has pardoned the claimant, that a court has vacated the conviction of the claimant, or that the conviction was reversed and remanded for a new trial and no subsequent conviction was obtained;

> (3) That he or she was innocent of the crime or crimes under subdivision (1) of this section; and

> (4) That he or she did not commit or suborn perjury, fabricate evidence, or otherwise make a false statement to cause or bring about such conviction or the conviction of another, with respect to the crime or crimes under subdivision (1) of this section, except that a guilty plea, a confession, or an admission, coerced by law enforcement and later found to be false, does not constitute bringing about his or her own conviction of such crime or crimes.

The State stipulated that Dean and Taylor could prove by clear and convincing evidence the requirements in subsections (1), (2), and (3). Dean and Taylor stipulated that all of their statements regarding the Wilson murder were factually false. The sole disputed issue under § 29-4603 was whether the factually false statements constituted "perjury," "fabricat[ed] evidence," or "false statement[s]" under § 29-4603(4).

After receiving expert testimony at trial, the district court found that Dean and Taylor both genuinely believed that they

were telling the truth during the investigation of Wilson's murder and at White's trial. Dr. Eli Chesen, a licensed psychiatrist, testified that Dean suffered from "post-traumatic distress" syndrome and "Stockholm Syndrome" when he admitted his guilt in statements to police and testified at White's trial. Dr. Chesen testified that Taylor had also suffered from Stockholm Syndrome, in addition to a "severe, schizotypical disorder." Dr. Richard Leo, a law professor with a Ph.D. in jurisprudence and social policy, reviewed both Dean's and Taylor's histories and opined that they had made "persuaded false confession[s]." Dr. Leo testified that at the time the statements and testimony were given, Dean and Taylor subjectively believed the veracity of what they said.

The district court held that as used in § 29-4603(4), "perjury," "fabricate evidence," and "false statement" each included a requirement of "knowledge and/or intent" by their plain language. As to "perjury," the court cited the definition of the crime in Neb. Rev. Stat. § 28-915(1) (Reissue 2008), which requires that the person charged did "not believe [his or her statement] to be true." The court held that the phrase "fabricate evidence" is equivalent to the word "lie" and that "lie" is defined as "a statement that one knows is false." Finally, the court focused on the word "false" in the phrase "false statement" and emphasized that "the majority of its accepted definitions . . . require intent or knowledge that one is not telling the truth." Because it found that Dean and Taylor had subjectively believed the truth of their statements, the district court determined that § 29-4603(4) was not an obstacle to their recovery. It awarded $300,000 in damages to Dean and $500,000 in damages to Taylor.

## II. ASSIGNMENTS OF ERROR

The State assigns that the district court erred by construing § 29-4603(4) to include a state-of-mind element. On cross-appeal, Dean assigns that the district court erred in determining the amount of damages which proximately resulted from his conviction.

## III. STANDARD OF REVIEW

[1] Statutory interpretation is a question of law, which an appellate court resolves independently of the trial court.[4]

[2] Pursuant to § 29-4607, an action under the Act is filed under the State Tort Claims Act, Neb. Rev. Stat. §§ 81-8,209 to 81-8,235 (Reissue 2008 & Cum. Supp. 2012). A district court's findings of fact in a proceeding under the State Tort Claims Act will not be set aside unless such findings are clearly erroneous.[5]

## IV. ANALYSIS

### 1. State's Appeals

The State's appeal in each case rests upon the sole premise that the district court erred in determining the meaning of the phrase "false statement" as used in § 29-4603(4). We are therefore presented with an issue of statutory interpretation.

[3,4] Statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.[6] A court must attempt to give effect to all parts of a statute, and if it can be avoided, no word, clause, or sentence will be rejected as superfluous or meaningless.[7] Thus, we begin our inquiry by examining the plain meaning of the phrase "false statement" as it is used in § 29-4603(4). The parties do not dispute the meaning of the word "statement," but they disagree on the meaning of "false." The State's position is that a statement which is not factually accurate is necessarily "false." Dean and Taylor contend that "false" means, essentially, "known to be untrue."

Each side finds support in standard dictionary definitions of the term, which include meanings that encompass some form of scienter, such as "[d]eceitful," "lying," "dishonest,"

---

[4] *Vlach v. Vlach*, 286 Neb. 141, 835 N.W.2d 72 (2013).

[5] *Cingle v. State*, 277 Neb. 957, 766 N.W.2d 381 (2009).

[6] *ML Manager v. Jensen*, 287 Neb. 171, 842 N.W.2d 566 (2014).

[7] *In re Estate of Lienemann*, 277 Neb. 286, 761 N.W.2d 560 (2009).

or "meant to deceive," and meanings that could include an innocent but factually incorrect statement, such as "[u]ntrue," "not true," or "in error."[8] The fact that the word "false" is itself reasonably susceptible of a meaning which incorporates scienter, i.e., "an intent to deceive, manipulate, or defraud,"[9] weakens the State's argument that if the Legislature had meant to modify the phrase "false statement" with the words "knowingly" or "intentionally," it would have done so. As the district court noted, it is at least equally plausible that the Legislature believed that adding a modifier such as "knowingly" or "intentionally" would be redundant.

[5,6] Because the word "false" is susceptible to more than one reasonable interpretation, we conclude that it is ambiguous and therefore subject to judicial interpretation.[10] In construing a statute, a court looks to the statutory objective to be accomplished, the evils and mischiefs sought to be remedied, and the purpose to be served. A court must then reasonably or liberally construe the statute to achieve the statute's purpose, rather than construing it in a manner that defeats the statutory purpose.[11] The fundamental objective of statutory interpretation is to ascertain and carry out the Legislature's intent. An interpretation that is contrary to a clear legislative intent will be rejected.[12] That which is implied in a statute is as much a part of it as that which is expressed.[13]

### (a) Legislative History

[7] An appellate court can examine an act's legislative history if a statute is ambiguous or requires interpretation.[14] Dean

---

[8] See, e.g., Black's Law Dictionary 718 (10th ed. 2014); Webster's New World College Dictionary 489 (3d ed. 1996).

[9] Black's Law Dictionary, *supra* note 8 at 1463.

[10] See *Lozier Corp. v. Douglas Cty. Bd. of Equal.*, 285 Neb. 705, 829 N.W.2d 652 (2013).

[11] *Fisher v. PayFlex Systems USA*, 285 Neb. 808, 829 N.W.2d 703 (2013); *Blakely v. Lancaster County*, 284 Neb. 659, 825 N.W.2d 149 (2012).

[12] *Fisher v. PayFlex Systems USA, supra* note 11.

[13] *Pepitone v. Winn*, 272 Neb. 443, 722 N.W.2d 710 (2006).

[14] See *Fisher v. PayFlex Systems USA, supra* note 11.

argues on appeal that "the wrongful convictions of the Beatrice Six . . . were *the reason* for the statute's enactment."[15] The legislative history certainly shows that the convictions of the Beatrice Six were on the Legislature's mind.[16] However, while helpful and informative in a general sense, the legislative history is not dispositive on the specific question of whether the Legislature intended the phrase "false statement" as used in § 29-4603(4) to include a factually inaccurate statement which the speaker genuinely believed to be true at the time it was made.

### (b) Waiver of Sovereign Immunity

[8,9] The State argues that interpreting the phrase "false statement" to include a requirement of "knowledge and/or intent" is contrary to the rule of strict construction of statutes that waive sovereign immunity. Statutes that purport to waive the protection of sovereign immunity of the State or its subdivisions are strictly construed in favor of the sovereign and against the waiver. A waiver of sovereign immunity is found only where stated by the most express language of a statute or by such overwhelming implication from the text as will allow no other reasonable construction.[17] This principle has been said to create a presumption against waiver.[18]

[10,11] While this principle must be factored into our analysis, we do not regard it as dispositive. We decline to hold that the rule of strict construction for statutes waiving sovereign immunity should always trump other canons of statutory interpretation, including the overriding goal of giving effect to the purpose and intent of the Legislature when construing ambiguous language in a statute. Clearly, the Act itself is a

---

[15] Brief for appellee and cross-appellant Dean at 31 (emphasis in original).

[16] See Judiciary Committee Hearing, L.B. 260, 101st Leg., 1st Sess. 9 (Feb. 19, 2009); Floor Debates, 1st Sess. 10, 17-18, 21, 23-24, 28, 33 (Mar. 2, 2009); 1st Sess. 10-12, 15, 26, 39-40, 49-51, 54 (Mar. 3, 2009); 1st Sess. 43 (Mar. 24, 2009); and 1st Sess. 19-21, 25-26 (Mar. 25, 2009).

[17] *Zawaideh v. Nebraska Dept. of Health & Human Servs.*, 285 Neb. 48, 825 N.W.2d 204 (2013).

[18] See *Salazar v. Scotts Bluff Cty.*, 266 Neb. 444, 665 N.W.2d 659 (2003).

waiver of sovereign immunity. Our task in these cases is to determine the scope of the waiver, given the Legislature's use of an adjective that, standing alone, may be susceptible to more than one meaning. An appellate court does not consider a statute's clauses and phrases as detached and isolated expressions. Instead, the whole and every part of the statute must be considered in fixing the meaning of any of its parts.[19] When words of a particular clause, taken literally, would plainly contradict other clauses of the same statute, or lead to some manifest absurdity or to some consequences which a court sees plainly could not have been intended, or to result manifestly against the general term, scope, and purpose of the law, then the court may apply the rules of construction to ascertain the meaning and intent of the lawgiver, and bring the whole statute into harmony if possible.[20] Accordingly, we must consider the context in which the phrase "false statement" is used in the statute.

### (c) Consistent, Harmonious, and Sensible

[12] The rules of statutory interpretation require an appellate court to give effect to the entire language of a statute, and to reconcile different provisions of the statute so they are consistent, harmonious, and sensible.[21] In interpreting a statute, an appellate court will give effect to all parts of a statute and avoid rejecting as superfluous or meaningless any word, clause, or sentence.[22]

The Act permits persons who are actually innocent but nevertheless convicted of a crime to seek and obtain monetary redress from the State. But in order to do so, the claimant must affirmatively prove that he or she did not engage in certain conduct, i.e., "commit or suborn perjury, fabricate

---

[19] *Fisher v. PayFlex Systems USA, supra* note 11.

[20] *Anthony, Inc. v. City of Omaha*, 283 Neb. 868, 813 N.W.2d 467 (2012).

[21] *ML Manager v. Jensen, supra* note 6; *Amen v. Astrue*, 284 Neb. 691, 822 N.W.2d 419 (2012).

[22] *Id.*

evidence, or otherwise make a false statement" to bring about the conviction of the claimant or another.[23] Perjury, a Class III felony, involves the making of a "false statement under oath or equivalent affirmation" in an official proceeding by a person who "does not believe it to be true."[24] Subornation of perjury, also a Class III felony, consists of "persuad[ing], procur[ing], or suborn[ing] any other person to commit perjury."[25] Both acts involve an intent to deceive. So too does the phrase "fabricate evidence."

Section 29-4603(4) lists "perjury," "fabricate evidence," and "false statement" in a single sentence. Because the first two involve deceitful acts, it would be incongruous to define the phrase "false statement" to include a completely innocent act, particularly when doing so would disqualify an actually innocent but wrongfully convicted person from asserting a claim against the State, which is precisely the purpose of the Act. This conclusion is underscored by the fact that in general legal parlance, the phrase "false statement" is commonly understood to mean "[a]n untrue statement knowingly made with the intent to mislead."[26]

Reading the phrase "false statement" as used in § 29-4603(4) in accordance with this generally accepted meaning would not render other language in the statute meaningless or superfluous. A knowingly false statement which is not made under oath or affirmation does not constitute perjury. And one can fabricate evidence consisting of something other than a statement.

[13] But reading the phrase to include any factually incorrect statement, regardless of the maker's state of mind, would be inconsistent with the final clause of § 29-4603(4), which provides that a guilty plea, confession, or admission which is "coerced by law enforcement and later found to be false" does not constitute a bar to recovery. In these cases, the district

---

[23] § 29-4603(4).

[24] § 28-915(1).

[25] § 28-915(2).

[26] Black's Law Dictionary, *supra* note 8 at 1547.

court found, and the State does not dispute, that at the time of their incriminating statements, Dean and Taylor truly believed that they and other members of the Beatrice Six were involved in the murder of Wilson and that this belief was fostered by the psychological interrogation tactics and procedures employed by law enforcement. We can think of no logical reason why the Legislature would permit an innocent person who made a false but coerced confession to recover under the Act, but deny a right of recovery to an innocent person who was mentally conditioned by improper law enforcement conduct to make statements incriminating another, fully believing such statements to be true at the time they were made. In construing a statute, an appellate court will, if possible, try to avoid a construction which would lead to absurd, unconscionable, or unjust results.[27]

For these reasons, we conclude that the district court did not err in its interpretation of the phrase "false statement" as used in § 29-4603(4) or in its finding that Dean and Taylor did not make false statements under the Act.

## 2. Dean's Cross-Appeal

In his cross-appeal, Dean contends that his $300,000 damage award was inadequate. This is our first opportunity to address damages recoverable under the Act. The Act itself is not specific on recoverable elements of damage, providing only that a claimant may recover "damages found to proximately result from the wrongful conviction and that have been proved based upon a preponderance of the evidence."[28] But the amount of damages is capped by § 29-4604(4), which provides: "In no case shall damages awarded under the act exceed five hundred thousand dollars per claimant per occurrence." Although not at issue here, the Act further provides that the costs of imprisonment and the value of any care or education provided to a claimant during incarceration "shall not offset

---

[27] *Chase 3000, Inc. v. Nebraska Pub. Serv. Comm.*, 273 Neb. 133, 728 N.W.2d 560 (2007); *Bohaboj v. Rausch*, 272 Neb. 394, 721 N.W.2d 655 (2006).

[28] § 29-4604(1).

damages" and that no damages are payable "for any period of time during which [the claimant] was concurrently imprisoned for any unrelated criminal offense."[29]

We conclude that a claim under the Act sounds in tort. The Act specifically provides that a claim brought pursuant to its provisions "shall be filed under the State Tort Claims Act,"[30] which defines "tort claim" as a claim against the State "for money only on account of damage to or loss of property or on account of personal injury or death."[31] With respect to such claims, the State may be held liable "in the same manner and to the same extent as a private individual under like circumstances,"[32] subject to certain exceptions not applicable here and the statutory cap on the amount of damages recoverable. The statutory cause of action by a wrongfully convicted person is akin to the tort of false imprisonment, which is characterized as an action for personal injury.[33] Generally, damages recoverable in personal injury actions include both economic and noneconomic damages. Economic damages include lost wages, impairment of earning capacity, and the reasonable value of medical services necessitated by the injury. Noneconomic damages compensate the injured person for physical pain and mental suffering.[34]

The district court found that both Dean and Taylor had been deprived of their "liberty to be free as . . . innocent citizen[s]." In its attempt to place a monetary value on the mental pain and suffering resulting from this loss, the court noted: "What price is one's liberty to be free to live [his or her] life? It is so priceless it's no wonder the legislature placed a cap on any compensation awarded to any individual for errors of a wrongful conviction and one's loss of freedom." Noting its "Herculean task" in placing a monetary value on such loss,

---

[29] § 29-4604(2) and (3).

[30] § 29-4607.

[31] § 81-8,210(4).

[32] § 81-8,215.

[33] See *Gallion v. O'Connor*, 242 Neb. 259, 494 N.W.2d 532 (1993).

[34] See *id*. See, also, NJI2d Civ. 4.01.

the court found that considering the "totality of [the] circumstances" in each case, "Taylor shall recover damages found to proximately result from the wrongful conviction in the amount of $500,000.00" and "Dean shall recover damages found to proximately result from the wrongful conviction in the amount of $300,000.00."

[14,15] Generally, the amount of damages awarded in a case under the State Tort Claims Act is a matter solely for the finder of fact, whose decision will not be disturbed on appeal if it is supported by evidence and bears a reasonable relationship to the elements of damages proved at trial.[35] But where damages are subject to a statutory cap, as is the case here, the determination of damages is a two-stage process which involves an initial factual determination of the actual damages sustained by the injured party and then a legal application of the statutory cap if the actual damages exceed the statutory maximum recoverable amount. For example, in *Gourley v. Nebraska Methodist Health Sys.*,[36] we reasoned that a statutory cap on damages in a medical malpractice action did not deprive the plaintiffs of the constitutional right to a jury trial, because a jury makes the determination of actual damages and the court makes the legal determination of whether the cap should apply "only after the jury has fulfilled its factfinding function." In *Connelly v. City of Omaha*,[37] an action brought pursuant to the Political Subdivisions Tort Claims Act,[38] we held that actual damages sustained by the parents of a severely injured child should first be reduced by an amount attributable to the father's comparative negligence and then, because that amount exceeded the statutory cap, reduced further to the amount of the cap. In *Staley v. City of Omaha*,[39] another action brought pursuant to the Political Subdivisions Tort Claims Act,

---

[35] *Fickle v. State*, 273 Neb. 990, 735 N.W.2d 754 (2007).

[36] *Gourley v. Nebraska Methodist Health Sys.*, 265 Neb. 918, 954, 663 N.W.2d 43, 75 (2003).

[37] *Connelly v. City of Omaha*, 284 Neb. 131, 816 N.W.2d 742 (2012).

[38] See Neb. Rev. Stat. §§ 13-901 to 13-928 (Reissue 2012).

[39] *Staley v. City of Omaha*, 271 Neb. 543, 713 N.W.2d 457 (2006).

we affirmed an order determining that the plaintiff sustained compensatory damages in the amount of $2,933,402 but entering judgment in the amount of $1 million in order to comply with the statutory cap.

In Dean's case, the district court did not make a finding as to Dean's actual damages. From a colloquy between the court and Dean's counsel during closing argument, it appears that the court was of the belief that because it had awarded the maximum statutory recovery of $500,000 to Taylor, it was required to award a lesser amount to Dean because he had served only 5 years in prison compared to the nearly 20 years served by Taylor. But if both Dean and Taylor sustained actual damages exceeding the $500,000 cap, each would be entitled to recover that amount even if Taylor's actual damages exceeded those of Dean. Because the district court did not clearly state whether its damage award to Dean was based on his actual damages without regard to the statutory cap, it is impossible to determine whether the statutory cap was applicable and properly applied. Accordingly, we reverse and vacate Dean's damage award and remand the cause with directions to the district court to first make a factual determination of the actual damages sustained by Dean and then make a legal determination of whether the statutory cap is applicable to the determination of his recovery against the State.

## V. CONCLUSION

For the reasons discussed, we affirm the judgment in favor of Dean with respect to the State's liability; but we reverse and vacate the award of damages and remand the cause with directions to recalculate the amount of Dean's damages as set forth above. We affirm the judgment in favor of Taylor and against the State in all respects.

Judgment in No. S-12-974 affirmed in part and in part reversed and vacated, and cause remanded with directions.
Judgment in No. S-12-975 affirmed.