766 N.W.2d 381 (2009)
277 Neb. 957
Colleen CINGLE, Special Administrator of the Estate of Daniel Luethke, deceased, appellant,
v.
STATE of Nebraska, appellee.
No. S-08-386.
Supreme Court of Nebraska.
June 19, 2009.
*383 Michael A. Nelsen and Ryan P. Bailey, of Hillman, Forman, Nelsen, Childers & McCormack, Omaha, for appellant.
Jon Bruning, Attorney General, and Linda L. Willard, Lincoln, for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, and MILLER-LERMAN, JJ.
STEPHAN, J.
On December 5, 2003, Daniel Luethke was in the custody of the State of Nebraska Department of Correctional Services at its Diagnostic and Evaluation Center (D & E) located in Lincoln, Nebraska. On that date, Luethke was assaulted and fatally injured by another prisoner at the facility. Colleen Cingle, as the special administrator of Luethke's estate, brought this action for damages against the State of Nebraska under the State Tort Claims Act,[1] alleging that negligence on the part of D & E employees was the proximate cause of Luethke's injuries and death. After conducting a bench trial, the district court for Lancaster County found no negligence on the part of D & E employees and entered judgment in favor of the State. Cingle appeals from that judgment.

FACTS

DANIEL LUETHKE
At all relevant times, Luethke was a resident of Seward, Nebraska. The parties stipulated that "[b]efore December 5, 2003, ... Luethke had displayed symptoms of bipolar disorder." He took medications for this condition. Luethke was adjudicated as mentally ill in Butler County, Nebraska, in 2000, and he had received mental health treatment at the Lincoln Regional Center and the "Bryan Crisis Center" in Lincoln.
In the early morning hours of December 5, 2003, Luethke's mother called the Seward County sheriff and reported that she feared he could harm himself or others. She also reported, either during the telephone call or when deputies arrived, that Luethke had made a threatening statement. Sheriff's deputies took Luethke into custody on one felony and two misdemeanor charges and transported him to the Seward County jail. While lodged at the county jail, Luethke made threatening comments to the sheriff and his staff, broke the glass in his holding cell door, and flooded his cell floor with water. At the time of these actions, Luethke was *384 lodged alone in a cell and on a suicide watch, because jail officials felt that he might harm himself or others.
Due to Luethke's erratic behavior, the sheriff concluded that Luethke should be held elsewhere until his court appearance. The jail administrator contacted D & E about transferring Luethke to that facility as a "safekeeper." In addition to serving as the reception center for all males incarcerated in state penal institutions, D & E assists counties by taking safekeepers under a contractual agreement. In addition, D & E processes returnees to the Nebraska penal system, whether they are parole violators, interstate transfers, or transfers from community correction centers.
A deputy sheriff began the transport of Luethke from the Seward County jail to D & E in a patrol car equipped with a prisoner barrier separating the driver's compartment and rear passenger compartment. Luethke was placed in restraints for the transport. While en route, Luethke became agitated and the deputy called for backup. The sheriff arrived and assisted with the transport. When they arrived at D & E, the sheriff escorted Luethke to the admission area, removed the restraints, and instructed Luethke to go with a D & E officer. The sheriff and a D & E official executed a "Contract for Safekeeping," in which the sheriff represented that Seward County had lawful custody of Luethke and "want[ed] to procure a secure and convenient place of confinement for the safekeeper other than the county correctional facility or county jail."
Cpl. Doug Cheney, the D & E admissions officer who initially took custody of Luethke, testified that Luethke was loud and appeared to be upset, mostly with the deputy who had assisted in the transport from Seward County. Luethke became calmer and more cooperative when the sheriff and deputy left, and Cheney did not perceive him to be a threat to the institution or a potential victim.
Cpl. Jimmy Terrell, who observed Luethke during the initial admission process, described him as being very upset and demanding his medication. Terrell testified that he escorted Luethke to the D & E hospital and told Cpl. Daniel Wagner, who was on duty there, that Luethke should be kept separate from other inmates if possible and that he could "go off at any time." Luethke was no longer agitated or upset at the time of his arrival at the hospital, and Terrell's comments to Wagner were based upon Terrell's 1- to 3-minute observation of Luethke at the time of his original admission to D & E. Wagner did not recall whether or not Terrell made these comments.
Richard Randazzo, the admissions case manager at D & E, also observed Luethke at the time of his initial arrival in the early afternoon of December 5, 2003. Randazzo testified that Luethke was disruptive and abusive toward the sheriff and deputy upon arrival, but became calm and cooperative as soon as the sheriff and deputy left. Randazzo did not hear Terrell tell Wagner to place Luethke in a separate holding cell. At approximately 1:50 p.m. on that day, Randazzo conducted a case management interview with Luethke. During this interview, Luethke told Randazzo that he had a bipolar disorder but had not been taking medication. On a form entitled "Behavioral Observations and Suicide Assessment," Randazzo noted that Luethke had received inpatient treatment for his bipolar disorder approximately 18 months prior to the intake.
Based primarily upon his observations during the interview, Randazzo rated Luethke as a low risk for (1) violence toward other inmates, (2) violence toward staff, (3) general hostility, (4) victim potential, and (5) escape or security risk. *385 Randazzo also noted on one of the forms completed during the interview: "County ReportsLimited Space, Disciplinary Problem[,] Mental Health needs/Assaultive." According to Randazzo, Luethke insisted that he would not be at D & E for long because his family would provide money for a bond. Randazzo believed Luethke, which influenced Luethke's housing assignment. Given the potentially temporary nature of Luethke's stay, Randazzo assigned Luethke to hospital room No. 2. Despite this single-cell housing assignment, Randazzo did not have any concerns for Luethke's safety, and he knew that Luethke would be returning to a multiple-inmate holding cell until he completed intake and was transferred to his assigned housing.

KEVIN DIX
Kevin Dix was born on October 13, 1969. He has a lengthy criminal record which includes convictions for robbery, assault, escape, burglary, and theft. Dix was originally incarcerated in Nebraska, but in early 2003, he was transferred to a prison in Colorado at his request. Approximately 6 months later, he was transferred back to the Nebraska penal system, again at his request.
Prior to December 5, 2003, Dix committed numerous prison misconduct offenses, some of which involved assaults and fighting. For 2½ to 3 years immediately prior to his transfer to Colorado, Dix was on administrative segregation status in Nebraska, lodged in a cell by himself, as a result of a fight with a correctional officer. Dix was also placed on segregated status during his 2003 incarceration in Colorado, although the reason for this is not entirely clear from the record. The parties stipulated that "[p]rior to December 5, 2003, ... Dix had engaged in episodes of violence toward others, both while incarcerated and while not incarcerated, but to the extent known had not engaged in episodes of violence toward other inmates."
Dix was transported from Colorado to Nebraska on December 5, 2003. Upon his arrival, he was processed at D & E. Randazzo conducted a case management interview of Dix during the afternoon of December 5, after his interview with Luethke. Randazzo described Dix as cooperative and easygoing during the interview. Utilizing the same self-reporting technique as he did with Luethke, Randazzo rated Dix as a low risk for (1) violence toward other inmates, (2) violence toward staff, (3) general hostility, (4) victim potential, and (5) escape or security risk.
Randazzo testified that he took some information on Dix from computer files and then confirmed the information with Dix. But Dix testified that Randazzo did not access computer files during their interview. Randazzo testified that he did not access the "Segregated Confinement," "previous criminal history," or "misconduct, restoration, positive time information" segments of Dix's computerized records, nor did he ask Dix if he had been segregated in Colorado. He testified that this information was unnecessary, because prisoners transferring into the institution are not automatically segregated based upon prior actions.
Dix testified that during the interview, he asked Randazzo if he would be housed in segregation or in the general prison population and that Randazzo asked if there was a reason he should be segregated. Dix testified that he gave a negative response, but informed Randazzo that he had been segregated while confined in Nebraska before his transfer to Colorado, as well as during his confinement in Colorado. According to Dix, Randazzo replied, "well, I have nothing here so let's pretend this *386 conversation never existed." Randazzo was not asked about Dix's claim at trial.
Randazzo assigned Dix to a housing unit block within the general prison population. He knew that Dix would initially be placed back in the medical unit holding cell with Luethke and other inmates before going to his assigned housing unit, but he did not anticipate that this would cause any problem, because he had not observed any problems between Luethke and Dix while in the holding cell that day.

THE ASSAULT
Following Randazzo's separate interviews with Luethke and Dix, both were placed with five other inmates in a large holding cell adjacent to the medical screening area at D & E, and they were in this cell at 4 p.m. when the entire institution was locked down for the scheduled afternoon count. Wagner conducted the count of all inmates in the medical screening area, including those in the holding cell. Wagner testified that Luethke was calm and cooperative during the count and that he did not notice any unusual activity among the inmates in the holding cell.
When he completed his count, Wagner went to a nearby food preparation area and began preparing meals for the inmates. While doing this, he heard someone "kicking or ... banging" on the door of the holding cell. When Wagner went to investigate, he observed Luethke banging on the door and asking when he would be fed. Wagner replied that as soon as the count had cleared, he would bring meals to the inmates. Wagner then went to the officer's station near the holding cell and called a lieutenant to report his encounter with Luethke. The lieutenant advised Wagner that after the count had cleared, Luethke would be moved to hospital room No. 2. Wagner testified that he perceived no reason to move Luethke immediately, and he could not have done so because the institution was still in lockdown status for the count.
Debra Saunders was a licensed practical nurse employed in the D & E hospital area on the day of the assault. She observed Wagner responding to Luethke's pounding on the holding cell door at 4:08 p.m. She testified that after Wagner spoke with Luethke at the cell door, Luethke stopped shouting and stepped away from the door to the interior of the cell.
After speaking with the lieutenant, Wagner returned to the food preparation area and resumed preparation of the inmates' meals. He was still engaged in this activity when the count cleared at 4:15 p.m. At this time, Luethke was no longer pounding on the cell door and Wagner was not aware of any unusual activity in the holding cell.
The assault occurred at approximately 4:17 p.m. Richard Zlomke, one of the inmates in the holding cell, testified that when Luethke was pounding on the cell door and demanding to be fed, Dix told him that he should stop or he would get in trouble. Zlomke and another inmate in the cell also attempted to calm Luethke. Zlomke testified that shortly thereafter, Luethke made a "challenging remark" to Dix, who immediately responded by assaulting Luethke, repeatedly striking him with his fists and kicking him. Zlomke testified that the assault lasted less than a minute and that Luethke did not defend himself.
From the nurse's station, Saunders observed Luethke hit the window of the holding cell with some force. She initially thought Luethke was having a seizure and proceeded to the holding cell. Wagner, who was still working in the food preparation area, heard a "very loud thump[ing] noise" from the vicinity of the holding cell and walked quickly in that direction. He *387 and Saunders met at the door to the cell. Wagner looked into the cell and observed Luethke lying on the floor and Dix standing over him. He notified the emergency response team and then, contrary to protocol, unlocked the cell before the response team arrived so that Saunders could enter and provide medical aid to Luethke. As a result of injuries sustained in the assault, Luethke was left in a persistent vegetative state. He died from his injuries on October 5, 2005, at the age of 34.
In this action, Cingle alleged that employees of D & E were negligent in placing Luethke in the same holding cell as Dix, "when they knew or should have known that Dix was a violent, unstable person likely to cause harm to [Luethke.]" Cingle also alleged that D & E employees were negligent in supervising the inmates in the holding cell, in failing to separate Luethke and Dix, and in failing to respond to the assault in a "timely fashion." The State denied that its employees were negligent and asserted various other defenses.
Following a bench trial at which experts testified on behalf of each party, the district court entered judgment for the State. The court found that D & E employees were not negligent because they "could not have reasonably foreseen that Dix would attack Luethke while in the holding cell on December 5, 2003." In reaching this conclusion, the court reasoned that Luethke's aggressive behavior upon admission to D & E was not directed at Dix, but, rather, was directed at the sheriff's deputy who transported him. The court found that there was "no indication of a particular threat existing between Luethke and Dix that would require the staff to provide extra protection for Luethke." The court also reasoned that because neither Luethke's mental state nor Dix's history of assaultive behavior was unique among prison inmates, D & E employees could have reasonably concluded that it was unnecessary to place them in separate cells.
Cingle perfected this timely appeal, which we moved to our docket on our own motion pursuant to our authority to regulate the caseloads of the appellate courts of this state.[2]

ASSIGNMENT OF ERROR
Cingle assigns that the district court erred in finding that D & E employees were not negligent in their handling of Luethke.

STANDARD OF REVIEW
A district court's findings of fact in a proceeding under the State Tort Claims Act will not be set aside unless such findings are clearly erroneous.[3]

ANALYSIS

LEGAL STANDARD
Cingle first argues that the district court applied an incorrect legal standard in finding that D & E employees were not negligent in placing Luethke and Dix in the same holding cell. When one person owes a legal duty to another, the standard of care which defines the scope and extent of the duty is typically general and objective and is often stated as the reasonably prudent person standard, or some variation thereof; that is, what a reasonable person of ordinary prudence would have done in the same or similar circumstances.[4] We stated the *388 standard of care which defines the scope and extent of the duty owed by prison officials to inmates most recently in Goodenow v. State[5]: "A jailer is bound to exercise, in the control and management of the jail, the degree of care required to provide reasonably adequate protection for his or her inmates." The district court cited this standard in its order, but also cited Mosby v. Mabry,[6] a federal appellate court decision involving an assault by one inmate upon another. The district court paraphrased the following principle stated in Mosby: "Liability exists only if the warden or jailer knew of the risk of such injury or should have known of it and with actual or constructive knowledge, failed to prevent such an attack."[7] Cingle argues that by stating this principle, the district court applied the incorrect standard of care in assessing her allegations of negligence on the part of D & E employees.
We disagree. We do not read Mosby as being inconsistent with Goodenow. What constitutes "reasonably adequate protection" under the Goodenow standard necessarily depends upon what correctional officers knew or should have known about a particular risk of injury before it occurred. For example, in Sherrod v. State,[8] we affirmed a judgment in favor of a person who, while incarcerated, was beaten by his cellmate and sustained significant injuries. Noting the duty of jailers to exercise the degree of care required in order to provide reasonably adequate protection for inmates, we concluded that there was evidence that correctional officers "either knew or should have known" of a threat which preceded the assault and were therefore negligent in failing to separate the two prisoners.[9] This is not to say that correctional officers can be liable to an inmate assaulted by another inmate only if there is a prior specific threat, and we do not read the district court's order in this case as applying such a bright-line rule. Although the court did make a finding that "D & E staff had no indication of a particular threat existing between Luethke and Dix that would require the staff to provide extra protection for Luethke," it also examined other factors, including Luethke's mental status and Dix's prison history, in reaching its conclusion that D & E employees could not have reasonably foreseen the assault. The district court applied the same legal standard applied in Goodenow and Sherrod. We therefore proceed to the question of whether the court erred in its finding of facts.

SUFFICIENCY OF EVIDENCE
As noted in Sherrod, we are mindful that in reviewing a judgment awarded in a bench trial, the appellate court does not reweigh the evidence, but considers the judgment in a light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence.
Cingle argues that contrary to the district court's finding, there was evidence that Dix threatened Luethke before assaulting him. One inmate in the cell at the time of the assault told investigators that during the brief verbal exchange which preceded the assault, Dix said to Luethke, "`You fuck with me and I'll kill you.'" *389 However, it is clear that this threat was made almost immediately before the assault, and there is no evidence that any D & E employee was or could have been aware of the threat before the assault occurred. Thus, the finding of the district court that D & E staff were not aware of a threat is not clearly erroneous.
Cingle's primary theory at trial was that based upon the information regarding Luethke and Dix that D & E employees actually had or could have obtained by a more thorough investigation of Dix's background, they were negligent in not anticipating the assault and placing the men in separate cells in order to prevent the assault. Stated another way, Cingle argued that based upon the evidence presented at trial, the applicable standard of care required separation of Luethke and Dix in order to protect Luethke from harm.
While the existence of a duty and the identification of the applicable standard of care are questions of law, the ultimate determination of whether a party deviated from the standard of care and was therefore negligent is a question of fact.[10] To resolve the issue, a finder of fact must determine what conduct the standard of care would require under the particular circumstances presented by the evidence and whether the conduct of the alleged tort-feasor conformed with the standard.[11] When the conduct in question involves specialized knowledge, skill, or training, expert testimony may be helpful or even necessary to a determination of what the standard of care requires under particular circumstances.[12]
Both parties in this case utilized expert witnesses for this purpose. The two qualified experts, after reviewing the essentially undisputed facts, reached conflicting opinions as to whether the conduct of D & E employees deviated from the standard of care. Victor Lofgreen, Ph.D., testified on behalf of Cingle. Lofgreen is a university professor and research scientist. He has prior experience as a military police officer, as a caseworker for the Nebraska Department of Correctional Services, as chief of the corrections division of the Nebraska Crime Commission, and as superintendent of the Nebraska Correctional Center for Women. Lofgreen reviewed various records pertaining to the assault and testified that in his opinion, with a reasonable degree of certainty, D & E employees violated the standard of care in handling Luethke and Dix and that this failure led to the assault of Luethke. Lofgreen was critical of the fact that information on Luethke's bipolar condition was documented on the initial telephone interview intake form but was not given to Randazzo or the medical screening staff. Lofgreen opined that Luethke should have been housed in a separate cell based solely upon his bipolar disorder, that it is improper to house safekeepers with the general prison population, and that Wagner was wrong to disregard Terrell's suggestion that Luethke be placed in his own cell.
With regard to Dix, Lofgreen was critical of the fact that D & E employees did not have the information packet which usually accompanies a transfer and includes classification and mental health information. Lofgreen was critical of Randazzo's classification interview with Dix and testified *390 that in view of his violent history, Dix should have been placed in an "isolation setting." Lofgreen further testified that Dix's own mental and behavioral history warranted treating him as a "special needs inmate" and keeping him apart from other inmates. Lofgreen expressed his opinion that the assault was an event which D & E employees should have foreseen, based on the histories of both parties.
The State's expert witness, Jeffrey Schwartz, Ph.D., is a criminal justice consultant who has worked with various law enforcement and correctional agencies since 1968. He conducts critical incident reviews after major security breaches and specializes in emergency preparedness and response in correctional institutions. He is a regular consultant for the National Institute of Corrections.
In addition to reviewing relevant documents, Schwartz personally visited D & E and interviewed Randazzo and Saunders. He testified that almost all state correctional facilities and city and county jails utilize multiple-occupancy holding cells during the intake process, because placing inmates in separate cells during intake is more difficult to supervise and requires more staff. Schwartz disputed Lofgreen's contention that safe-keepers should be segregated as a matter of course and noted that safekeepers are generally treated like any other incoming inmate.
Schwartz testified that Luethke's aggressive behavior when he first arrived at D & E was not unusual for an inmate in these circumstances, and he noted that there was no indication that Luethke was acutely suicidal or floridly psychotic. Schwartz noted that Luethke assured Randazzo and Saunders that he was not suicidal, despite his statements to the contrary to the Seward County law enforcement officers. He noted that Randazzo calmed Luethke and brought him to a point where he was compliant and cooperative during the intake process.
Schwartz was critical of D & E employees in some respects. He concluded that Randazzo erred in rating both Luethke and Dix as low risk for all the factors on the initial screening intake form. In his opinion, Saunders and Randazzo should have received the information taken by D & E from Seward County in the initial call. Schwartz was critical of the failure to make available the Nebraska penal institutional history on Dix and the failure to request information from Colorado on Dix. Schwartz testified that even if these errors had not occurred, there would have been an insufficient factual basis for placing Dix in a separate cell. However, Schwartz testified to a reasonable degree of certainty that even with the additional information which D & E employees could have obtained, there would have been no basis for placing Dix in a separate cell in either the booking area or the hospital area and that "it would not have risen to where that was a very difficult or close call."
Schwartz testified that only extraordinary safety issues require immediate segregation on intake and that it is most common for previously segregated inmates to go through intake like every other inmate. Exceptions would be those inmates who had multiple escape attempts or those who were so assaultive that additional guards were required for transport. In Schwartz' opinion, Dix would not have qualified as one of the top 1 or 2 percent of assaultive inmates in any state department of corrections. Schwartz opined that Dix was clearly more assaultive than the average inmate, not easy to work with, and had more staff altercations and time in segregation, but that Dix "isn't real close" to being among the most dangerous inmates. Based on a review of Dix's disciplinary record, Schwartz concluded that Dix *391 would not fit the profile of a predatory inmate.
Schwartz noted there was no indication at intake that Luethke was acutely suicidal, suffering acute psychotic behavior, or hallucinating. D & E employees had no confirmed bipolar diagnosis, only speculation from the Seward County sheriff's office. Schwartz testified that in his opinion, there was no good basis for placing Luethke in a single cell at intake, and that it was reasonable to put Luethke in a multiple cell in both the booking area and medical area. According to Schwartz, Luethke neither was acting out to the point that he was likely to be assaultive toward others nor was his mental health condition deteriorated to the point that he should not have been placed with others. Schwartz explained that Luethke "was not close to psychotic. That really ... would not have been a close call at all. Many inmates come in in worse shape in terms of mental health than ... Luethke ...."
Schwartz opined that based on all the evidence he reviewed for this case, the assault was not predictable. He further testified that supervision in the hospital area was adequate and noted that no inmate requires continuous supervision. Schwartz testified that Wagner and Saunders responded appropriately when the assault occurred, except that Wagner breached security protocol by unlocking the cell door before the emergency response team arrived in order for Saunders to enter and provide immediate medical care to Luethke.
Determining the weight that should be given expert testimony is uniquely the province of the fact finder.[13] In this case, it appears that the district court gave more weight to the testimony of the State's expert than to that of Cingle's expert. That was its prerogative. There is evidence in the record from which a finder of fact could reasonably conclude that D & E employees were not negligent in failing to anticipate and prevent the fatal assault, or in any other respect. We therefore cannot conclude that the factual findings on which the district court based its judgment were clearly erroneous.

CONCLUSION
For the reasons discussed, we affirm the judgment of the district court.
AFFIRMED.
McCORMACK, J., not participating.
NOTES
[1] Neb.Rev.Stat. §§ 81-8,209 to 81-8,235 (Reissue 2003).
[2] See Neb.Rev.Stat. § 24-1106(3) (Reissue 2008).
[3] See, Fickle v. State, 273 Neb. 990, 735 N.W.2d 754 (2007); Hradecky v. State, 264 Neb. 771, 652 N.W.2d 277 (2002).
[4] See Cerny v. Cedar Bluffs Jr./Sr. Pub. Sch., 262 Neb. 66, 628 N.W.2d 697 (2001).
[5] Goodenow v. State, 259 Neb. 375, 380, 610 N.W.2d 19, 22 (2000).
[6] Mosby v. Mabry, 697 F.2d 213 (8th Cir. 1982).
[7] Id. at 215.
[8] Sherrod v. State, 251 Neb. 355, 557 N.W.2d 634 (1997).
[9] Id. at 365, 557 N.W.2d at 641.
[10] See Cerny v. Cedar Bluffs Jr./Sr. Pub. Sch., supra note 4.
[11] See id. See, also, Restatement (Second) of Torts § 328 C. comment b. (1965).
[12] Cerny v. Cedar Bluffs Jr./Sr. Pub. Sch., supra note 4.
[13] Staley v. City of Omaha, 271 Neb. 543, 713 N.W.2d 457 (2006); Cerny v. Cedar Bluffs Jr./Sr. Pub. Sch., 267 Neb. 958, 679 N.W.2d 198 (2004).