Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/16/2019 12:07 AM CDT

Rhonda Reiber, Special Administrator of the
Estate of Chad Gesin, deceased, appellant,
v. County of Gage, Nebraska, and
Millard Gustafson, Gage County
Sheriff, appellees.

___ N.W.2d ___

Filed June 7, 2019.    No. S-18-692.

1. **Political Subdivisions Tort Claims Act: Appeal and Error.** In actions brought pursuant to the Political Subdivisions Tort Claims Act, the factual findings of a trial court will not be disturbed on appeal unless they are clearly wrong.

2. **Judgments: Appeal and Error.** In reviewing a judgment awarded in a bench trial, the appellate court does not reweigh the evidence, but considers the judgment in a light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence.

3. **Statutes.** Statutory interpretation presents a question of law.

4. **Trial: Expert Witnesses: Appeal and Error.** An appellate court reviews for abuse of discretion a trial court's decision whether to admit or exclude an expert's testimony.

5. **Rules of Evidence: Expert Witnesses.** In a bench trial, an expert's testimony will be admitted under Neb. Evid. R. 702, Neb. Rev. Stat. § 27-702 (Reissue 2016), and given the weight to which it is entitled.

6. **Negligence: Evidence.** While the existence of a duty and the identification of the applicable standard of care are questions of law, the ultimate determination of whether a party deviated from the standard of care and was therefore negligent is a question of fact.

7. **Negligence: Expert Witnesses.** When the conduct in question involves specialized knowledge, skill, or training, expert testimony may be helpful or even necessary to a determination of what the standard of care requires under particular circumstances.

8. **Trial: Expert Witnesses.** The determination of the weight that should be given expert testimony is uniquely the province of the fact finder.

9. **Political Subdivisions Tort Claims Act: Immunity: Waiver.** The Political Subdivisions Tort Claims Act reflects a limited waiver of governmental immunity and prescribes the exclusive procedure for maintenance of a tort claim against a political subdivision or its officers, agents, or employees.

10. **Political Subdivisions Tort Claims Act: Immunity: Negligence.** The Political Subdivisions Tort Claims Act eliminates, in part, the traditional immunity of political subdivisions for the negligent acts of their employees.

11. **Actions: Dismissal and Nonsuit: Immunity.** A suit that is barred by sovereign immunity is dismissed for lack of subject matter jurisdiction.

12. **Statutes: Immunity: Waiver.** Statutes that purport to waive the protection of sovereign immunity of the State or its subdivisions are strictly construed in favor of the sovereign and against the waiver.

13. **Political Subdivisions Tort Claims Act: Immunity: Waiver: Appeal and Error.** In order to strictly construe the Political Subdivisions Tort Claims Act against a waiver of sovereign immunity, an appellate broadly reads exemptions from a waiver of sovereign immunity.

Appeal from the District Court for Gage County: JULIE D. SMITH, Judge. Affirmed.

Lyle J. Koenig, of Koenig Law Firm, for appellant.

Brandy R. Johnson, of Governmental Law, L.L.C., for appellees.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, STACY, FUNKE, PAPIK, and FREUDENBERG, JJ.

FUNKE, J.

Chad Gesin committed suicide while in the Gage County jail. Gesin's mother Rhonda Reiber, the special administrator of Gesin's estate, brought this negligence action against the County of Gage, Nebraska, the Gage County sheriff, and unknown Gage County sheriff's employees under the Nebraska Political Subdivisions Tort Claims Act (PSTCA), Neb. Rev. Stat. §§ 13-901 to 13-928 (Reissue 2012). Reiber alleged that the defendants failed to follow the jail's established protocol

and knew, or in the exercise of reasonable care should have known, that Gesin was suicidal. Following a bench trial solely on the issue of liability, the district court found that the defendants had exercised due care and that Reiber's action was barred by sovereign immunity under § 13-910(1). Reiber appeals from that judgment. We agree with the findings of the district court. Accordingly, we affirm.

## BACKGROUND

### ARREST

On July 4, 2013, at 4:30 p.m., Gesin was arrested by Nebraska State Patrol Investigator Neal Trantham in downtown Beatrice, Nebraska, after Trantham observed Gesin making "punching-type motions" toward occupants of a minivan. Trantham testified that Gesin was initially noncompliant. Trantham drew his baton, verbally commanded Gesin to get on the ground, and placed Gesin in handcuffs. Trantham smelled alcohol on Gesin and described him as upset, angry, and agitated. Trantham called for backup, and Officer Shane Maloley of the Beatrice Police Department arrived on the scene.

While at the scene, Maloley told Trantham about a previous contact Maloley had had with Gesin. Maloley stated that in September 2011, he arrested Gesin, and that during that arrest, Gesin was heavily intoxicated with a blood alcohol content of 0.214. Gesin stabbed himself with a knife numerous times in the chest and while in police custody told Maloley that he wanted to die. Maloley determined that Gesin was an immediate danger to himself or others and placed him in emergency protective custody (EPC). Gesin was transported to the hospital and released 3 days later.

Gesin's girlfriend told Trantham that Gesin had assaulted her earlier in the day and had sent her a text message which she thought might be threatening suicide. Trantham asked her go to the Beatrice Police Department where he could later conduct a more indepth interview with her. Trantham then transported Gesin to the Gage County jail.

## Booking

At 5:13 p.m., Trantham and Maloley arrived at the jail facility with Gesin. The correctional officers on duty at that time were Christina Lock and Trevor Rue. Trantham told Rue that Gesin was "amped up," which Trantham testified meant to be careful because Gesin might be "likely to fight." Trantham also relayed Maloley's comments that Gesin had stabbed himself during a prior incident.

In accordance with jail policy and procedures, Trantham completed a custody authorization form. One of the questions listed on the form was, "Has this arrestee demonstrated any behaviors that might suggest suicidal tendencies? If yes, what?" Trantham wrote, "Possibly — text message earlier threatening." At that time, Trantham had not actually read the text message. He testified that this written comment referred to "the vague statement that [Gesin's girlfriend] had made to me at the scene." Trantham testified that at the time of booking, based upon his observations and experience, he did not believe that Gesin was at risk to commit suicide, but was merely angry and frustrated about being arrested.

Trantham later read the text message while at the Beatrice Police Department. The message read, "[R]emember what I said kill you for myself." After reading the message, Trantham did not think that the message was a suicidal comment. Trantham testified there was another message that stated, "It's a good thing you can't see what I'm about to do." Trantham described the message as "very vague and open ended" and said that he "absolutely did not think [Gesin] was suicidal."

During the booking process, Trantham did not verbally express a concern to the jail staff that Gesin might be suicidal. The custody authorization form posed the question, "Has there been any indication that the arrestee is acting so negatively toward [his or her] charge(s) that [he or she] might engage in self-harming behavior? If yes, what have you observed?" Trantham wrote, "Not observed." He also wrote that he had

not observed Gesin to have displayed any behaviors that would indicate mental illness.

Gesin's booking process lasted approximately 1 hour and was recorded by the jail's stationary surveillance camera which captured video and audio. The following exchange was recorded and played at trial:

> [Trantham:] How do you spell your last name, Chad?
>
> [Gesin:] Figure it out, you're an investigator, investigate.
>
> [Maloley:] G-E-S-I-N, I've arrested him before.
>
> [Gesin:] On a domestic, right?
>
> [Maloley:] Terroristic threats.
>
> [Gesin:] Terroristic threats, stabbed myself nine fucking times in the fucking chest . . . yeah, shit happens . . . and I didn't go to jail then, did I?
>
> [Maloley:] I EPCed you.
>
> [Gesin:] I was out in three fucking days.
>
> [Maloley:] Good, I'm glad you got better.
>
> [Gesin:] And I beat the charges too, yeah.
>
> [Maloley:] That's good, I heard that, I believe your mom went in and signed a release of prosecution, didn't she?
>
> [Gesin:] I believe she didn't, she says she didn't, she didn't do shit.

Trantham characterized this exchange as Gesin's "bragging about the charges that were dismissed and that he didn't face any consequences for that arrest." Trantham left the jail shortly thereafter.

Maloley testified that Gesin was angry and agitated with Trantham. Maloley did not think an EPC was necessary, because Gesin did not seem suicidal and, unlike the 2011 incident, Gesin had not made a specific threat to end his life. Maloley testified that he would not have anticipated what Gesin later would do and that he would have said something if he thought Gesin was a suicide risk. Prior to leaving the jail facility, Maloley asked Gesin if he could leave without Gesin's giving the jail staff any trouble. Gesin replied, "I

gotta live with these fuckers, you think I'm gonna give them hell?" Maloley testified that based on Gesin's comments, he was reassured that Gesin had calmed down and did not have any concerns about Gesin's safety. Lock testified that once Trantham left, Gesin became less agitated. Gesin complied with all parts of the booking process, including the taking of fingerprints and photographs, and reviewing and signing booking papers.

Evidence at trial focused on several forward-looking statements that Gesin made to jail staff during booking. Such statements, among others, included:

• "Court's open Friday? . . . Am I going to see the judge tomorrow for bail? . . . Monday?"
• "I want to see my discovery packet before I fucking say anything."
• To Rue: "Look, I got to live with you, so I'm not even gonna be rude to you."
• Good thing I get paid tomorrow . . . I can bail myself out tomorrow . . . with a debit card?"

Rue continued the booking process by asking Gesin questions from a standardized medical screening form. Rue asked Gesin: "Do you have a serious mental health condition which may need attention while you are here?" "Have you been hospitalized for emotional problems within the last year?" Gesin verbally answered "no" or shook his head in the negative. Rue asked Gesin: "Have you ever attempted suicide?" "Are you currently thinking about suicide?" Gesin verbally answered "no." Lock provided Gesin with a printed copy of his answers, which he signed.

Gesin took a preliminary breath test which registered his blood alcohol content of .103. Lock testified that Gesin did not appear to be severely intoxicated. She informed Gesin that, based on jail policy, he would be placed in a cell alone until his blood alcohol content lowered to .05.

Lock testified that she had received training in suicide prevention and stated that symptoms of a suicidal inmate included

previous suicide attempts, the presence of suicidal thoughts or plans, unusual reactions to being confined, and emotional withdrawal or isolation. Based on her observations, Gesin presented to her as an ordinary arrestee. She testified that it is common for arrestees to come into jail irritated and agitated about their charges. Lock did not have any concern that Gesin was a suicide risk and saw no reason to place Gesin on suicide watch.

Near the end of booking, Gesin spoke on the telephone with his mother and brother. Gesin asked them to post his bail and said that he would repay them the following day. Gesin expressed concern that he would lose his son and his job, and he became tearful for a brief period. Gesin's mother testified that she did not think Gesin was suicidal when she spoke with him on the telephone.

## Gesin's Suicide

At 6:05 p.m., Gesin was escorted from the booking room to a single-male, maximum-security cell due to his intoxication. Gesin was not placed on suicide watch. Had he been, he would have been stripped of his clothing, placed in a suicide smock, and given a blanket which is less likely to tear. Instead, he was provided with a regular blanket and "portable phone" located outside of his cell.

Gage County Sheriff Millard Gustafson testified that jail standards dictate that cell checks for inmates without any special needs are to be conducted once every hour. Checks on inmates who are intoxicated or on suicide watch are conducted four times per hour. Gustafson testified that checks on an inmate under special management are conducted on irregular rather than exact time intervals so that the inmate does not know exactly when the check will occur.

A shift change occurred with Rue's departure, and Officer Shana West came on duty. At 6:15 p.m., West performed the first cell check on Gesin, who appeared to be asleep in his bunk. The jail's telephone records show that Gesin placed

four calls from the portable telephone, between 6:19 p.m. and 6:24 p.m. Lock testified that she heard Gesin pressing keys on the telephone. At 6:40 p.m., Lock and West escorted female inmates back to their cells. At 6:45 p.m., Lock returned to Gesin's cell and found that Gesin had tied a blanket around the cell bars and his neck and appeared to be leaning forward in a seated position. Lock called for assistance and radioed for an ambulance, and she retrieved a hook knife from the booking room. A Gage County sheriff's deputy used the knife to cut Gesin free from the blanket. The deputy performed cardiopulmonary resuscitation on Gesin until the ambulance arrived. Gesin was transported to the hospital, where he was placed on life support. Gesin died on July 9, 2013.

Trial

Reiber, as the special administrator of Gesin's estate, filed suit in the district court for Gage County, asserting claims under the U.S. Constitution, the Nebraska Constitution, 42 U.S.C. § 1983 (2012), and the PSTCA. The lawsuit was removed to the U.S. District Court for the District of Nebraska. The federal court dismissed Reiber's constitutional and § 1983 claims and remanded the matter to the district court for Gage County for proceedings on Reiber's negligence claim under the PSTCA. Gage County and Gustafson (collectively appellees) filed a motion for summary judgment pursuant to § 13-910(1), which the court overruled. The court conducted a bifurcated bench trial on the issue of liability on January 25 and 26, 2018.

At trial, over Reiber's foundation and relevancy objections, the court heard testimony from appellees' expert witness Dr. Terry Davis, a psychiatrist who ran the Region VI Douglas County psychiatric crisis center in Omaha, Nebraska, from 1991 to 2001. Davis testified that the crisis center was essentially a psychiatric emergency room where he evaluated patients brought in by law enforcement or who came voluntarily or who were under a mental health board petition. Davis

would evaluate the individuals for dangerousness to self or others, presence of mental illness, and need for treatment and hospitalization. According to Davis, he evaluated over 8,000 patients while at the crisis center.

Davis opined that the 2011 incident in which Gesin stabbed himself was not a genuine suicidal attempt. Davis provided testimony based on his review of Gesin's medical records from 2011, which other witnesses had not discussed in their testimony. Davis stated that Gesin's medical records indicated that the stab wounds were fairly superficial and that Gesin had denied that the 2011 stabbing was a suicide attempt. Davis agreed with the decision made in 2011 to dismiss the EPC without a commitment.

Davis further testified that from the perspective of a psychiatrist in a clinical setting and based on information known at the time, he would not have thought Gesin to be suicidal in 2013. Davis stated that Gesin had some factors indicating suicidal risk, such as being a white male who had been drinking alcohol, but stated that Gesin's age, previous law violations, lack of a high level of intoxication, and forward-thinking behavior were not risk factors. Therefore, Davis would not have reasonably foreseen the need to undertake suicide precautions with Gesin. Davis also opined that the jail personnel appropriately evaluated and screened Gesin for suicide. The court found in its judgment on the merits that "Davis' testimony was credible, relevant, and helpful."

Following trial, the court determined that Reiber's action was barred under § 13-910(1), because appellees acted with due care in accordance with jail rules and regulations. The court found that even if the action were not barred under § 13-910(1), appellees would have prevailed on the merits of the negligence action, because Gesin's death was not reasonably foreseeable and appellees acted with reasonable care. Regarding the video of Gesin's statements to Maloley during booking, the court found that "it appears that [Gesin] was bragging and insinuating that he stabbed himself as a tactic to get

placed into [EPC] to avoid any criminal prosecution, and that the tactic was successful."

The court concluded that (1) Gesin's death was not reasonably foreseeable to the jail staff; (2) Reiber failed to prove that the jail staff lacked the appropriate training; (3) there was no claim that the jail staff failed to properly respond to an emergency; (4) there was no evidence that different staff members would have prevented Gesin's suicide; (5) it was not reasonably foreseeable that Gesin posed a threat to himself; (6) there was no reason to believe that Gesin needed to be transferred to a mental health facility; (7) Gesin was not placed in a safety cell with a suicide smock, because there was no reasonably foreseeable risk that he would harm himself; and (8) there was no evidence of negligent hiring or supervision.

Reiber appealed. We moved the appeal to our docket pursuant to our statutory authority to regulate the caseloads of the appellate courts of this state.[1]

ASSIGNMENTS OF ERROR

Reiber assigns, restated, that the district court erred in (1) permitting the expert witness testimony of Davis absent foundation, relevance, and assistance to the fact finder; (2) finding that the jail staff acted with due care in applying the rules of the Jail Standards Board; and (3) finding that appellees acted with reasonable care.

STANDARD OF REVIEW

[1,2] In actions brought pursuant to the PSTCA, the factual findings of a trial court will not be disturbed on appeal unless they are clearly wrong.[2] In reviewing a judgment awarded in a bench trial, the appellate court does not reweigh the evidence, but considers the judgment in a light most favorable to the successful party and resolves evidentiary conflicts in favor of

---

[1] See Neb. Rev. Stat. § 24-1106 (Cum. Supp. 2018).

[2] See *Cingle v. State*, 277 Neb. 957, 766 N.W.2d 381 (2009).

the successful party, who is entitled to every reasonable inference deducible from the evidence.[3]

[3] Statutory interpretation presents a question of law.[4]

[4] An appellate court reviews for abuse of discretion a trial court's decision whether to admit or exclude an expert's testimony.[5]

## ANALYSIS

We first address Reiber's contention that the district court erred by admitting Davis' testimony. We then discuss the court's conclusion that Reiber's claim is barred by sovereign immunity under § 13-910(1).

### No Abuse of Discretion

Reiber raises two arguments in support of his contention that the district court erred in admitting the expert witness testimony of Davis. First, Reiber argues Davis' testimony lacked foundation and relevance, because, as a psychiatrist and forensic psychiatrist, Davis could not render an opinion regarding the standard of care applicable to jailers. Second, Reiber argues Davis' testimony was not helpful to the trier of fact, because Davis' testimony that Gesin's suicide was not reasonably foreseeable amounted to an opinion as to how the court should decide the case.

[5] Whether a witness is qualified as an expert is a preliminary question for the trial court.[6] A trial court is allowed discretion in determining whether a witness is qualified to testify as an expert, and unless the court's finding is clearly erroneous, such a determination will not be disturbed on appeal.[7] In a

---

[3] *Id*. See, *Moreno v. City of Gering*, 293 Neb. 320, 878 N.W.2d 529 (2016); *Williams v. City of Omaha*, 291 Neb. 403, 865 N.W.2d 779 (2015).

[4] *Rohde v. City of Ogallala*, 273 Neb. 689, 731 N.W.2d 898 (2007).

[5] See *State v. Tucker*, 301 Neb. 856, 920 N.W.2d 680 (2018).

[6] *State v. Tolliver*, 268 Neb. 920, 689 N.W.2d 567 (2004); *State v. Aguilar*, 268 Neb. 411, 683 N.W.2d 349 (2004).

[7] *Id.*

bench trial, an expert's testimony will be admitted under Neb. Evid. R. 702, Neb. Rev. Stat. § 27-702 (Reissue 2016), and given the weight to which it is entitled.[8]

Evidence rule 702 governs the admissibility of expert testimony and provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." When faced with a proffer of expert scientific testimony, a trial judge must determine at the outset whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.[9] The trial court should focus on the principles and methodology utilized by expert witnesses, and not on the conclusions that they generate.[10] We have held in another context that expert testimony concerning a question of law is generally not admissible.[11]

[6] A negligence action brought under the PSTCA has the same elements as a negligence action brought against a private individual—a plaintiff must show a legal duty owed by the defendant to the plaintiff, a breach of such duty, causation, and damages.[12] While the existence of a duty and the identification of the applicable standard of care are questions of law, the ultimate determination of whether a party deviated from the standard of care and was therefore negligent is a question of fact.[13] To resolve the issue, a finder of fact must

---

[8] *City of Lincoln v. Realty Trust Group*, 270 Neb. 587, 705 N.W.2d 432 (2005).

[9] *Richardson v. Children's Hosp.*, 280 Neb. 396, 787 N.W.2d 235 (2010).

[10] *Id.*

[11] See *id.*

[12] *Ginapp v. City of Bellevue*, 282 Neb. 1027, 809 N.W.2d 487 (2012).

[13] *Cingle, supra* note 2.

determine what conduct the standard of care would require under the particular circumstances presented by the evidence and whether the conduct of the alleged tort-feasor conformed with the standard.[14]

[7] When one person owes a legal duty to another, the standard of care which defines the scope and extent of the duty is typically general and objective and is often stated as the reasonably prudent person standard, or some variation thereof; that is, what a reasonable person of ordinary prudence would have done in the same or similar circumstances.[15] When the conduct in question involves specialized knowledge, skill, or training, expert testimony may be helpful or even necessary to a determination of what the standard of care requires under particular circumstances.[16]

The threshold issue in any negligence action is whether the defendant owes a legal duty to the plaintiff.[17] Here, the parties do not dispute that prison officials owe inmates a legal duty, and we agree.[18] In *Goodenow v. State*,[19] we held that the standard of care by prison officials to inmates is as follows: "A jailer is required to exercise a degree of care necessary to provide reasonably adequate protection for his or her inmates." What constitutes "'reasonably adequate protection' . . . necessarily depends upon what correctional officers knew or should have known about a particular risk of injury before it occurred."[20]

---

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Bell v. Grow With Me Childcare & Preschool*, 299 Neb. 136, 907 N.W.2d 705 (2018).

[18] See, *Ginapp, supra* note 12; *Goodenow v. State*, 259 Neb. 375, 610 N.W.2d 19 (2000).

[19] *Goodenow, supra* note 18, 259 Neb. at 381, 610 N.W.2d at 23.

[20] *Cingle, supra* note 2, 277 Neb. at 966, 766 N.W.2d at 388 (citing *Goodenow, supra* note 18).

Reiber claims that Davis' testimony lacked foundation and relevance, because Davis had not reviewed the jail's protocols and had not examined Gesin in a clinical setting, and because "the standard of care for a psychiatrist evaluating a patient is not the same as that of a jailer evaluating a prisoner."[21]

Davis testified regarding his 10 years of experience in evaluating psychiatric patients who were admitted to the Douglas County psychiatric crisis center. Davis assessed patients for dangerousness to themselves or others, presence of mental illness, and need for treatment and hospitalization. In preparation for his testimony, Davis reviewed affidavits submitted by Trantham, Lock, and West; the booking video; the medical questionnaires completed during booking; the custody authorization form; and Gesin's hospital records from 2011 and 2013. Based on his experience and review of these materials, Davis opined that Gesin's stabbing incident in 2011 was not a genuine suicide attempt. In addition, Davis opined that, as a psychiatrist who adheres to a higher standard than that applicable to a jailer, he would not have considered Gesin to be a suicide risk based on the information known at the time.

Based on the record, we find that Reiber's claim that appellees knew or should have known Gesin was suicidal concerns an issue of specialized knowledge and that expert testimony would aid a finder of fact in evaluating the claim. Davis is a medical professional with experience assessing suicidal risk. Although as a psychiatrist, Davis' testimony was based upon a more stringent standard of care than that of a jailer, Davis discussed many of the same assessment factors required under the jail's procedures for screening for a suicidal inmate.

[8] We agree with the district court that Reiber's objections do not bear on Davis' qualifications or methodology, but, rather, go to the weight to be given to Davis' testimony. The determination of the weight that should be given expert

---

[21] Brief for appellant at 10.

testimony is uniquely the province of the fact finder.[22] As such, we find the court did not abuse its discretion in admitting Davis' testimony. Moreover, Reiber has not argued that she was unfairly prejudiced by the admission of Davis' testimony. In a civil case, the admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party.[23]

Regarding Reiber's second argument, evidence rules 701 and 702[24] allow opinion testimony, whether by a lay or expert witness, only if it is helpful to the trier of fact in making a determination of a fact in issue.[25] "The '"ultimate issue"' rule was an evidentiary rule in many jurisdictions that prohibited witnesses from giving opinions or conclusions on an ultimate fact in issue because such testimony, it was believed, '"usurps the function" or "invades the province" of the jury.'"[26] Evidence rule 704,[27] which abolished the ultimate issue rule in Nebraska, states that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

Under rule 704, the basic approach to opinions, lay and expert, is to admit them when helpful to the trier of fact.[28] Rule 704 does not lower the bar so as to admit all opinions, because

---

[22] *Fredericks Peebles v. Assam*, 300 Neb. 670, 915 N.W.2d 770 (2018).

[23] *O'Brien v. Cessna Aircraft Co.*, 298 Neb. 109, 903 N.W.2d 432 (2017).

[24] Neb. Evid. R. 701, Neb. Rev. Stat. § 27-701 (Reissue 2016), and § 27-702.

[25] See *State v. Reynolds*, 235 Neb. 662, 457 N.W.2d 405 (1990).

[26] See *State v. Rocha*, 295 Neb. 716, 732, 890 N.W.2d 178, 194 (2017) (quoting 1 McCormick on Evidence § 12 (Kenneth S. Broun et al. eds., 7th ed. 2013 & Supp. 2016), and citing *Chicago, R. I. & P. R. Co. v. Holmes*, 68 Neb. 826, 94 N.W. 1007 (1903); R. Collin Mangrum, Mangrum on Nebraska Evidence 760 (2016); and Fed. R. Evid. 704).

[27] Neb. Evid. R. 704, Neb. Rev. Stat. § 27-704 (Reissue 2016). See, also, Fed. R. Evid. 704.

[28] *Rocha, supra* note 26.

rules 701 through 703 provide the bases for exclusion.[29] Under these rules, a witness may not give an opinion as to how the case should be decided, but, rather, must leave the conclusions to be drawn by the trier of fact, because such opinions are not helpful.[30]

We disagree with Reiber's claim that Davis gave opinions as to how to decide the case and therefore provided opinions that were not helpful. Davis' testimony went directly to Reiber's theory that appellees failed to adhere to the jail's protocols and knew or should have known that Gesin was suicidal. Davis' testimony was based on evidence in the record and helped the court identify factors which can determine whether an individual in custody poses a suicide risk. Davis' testimony assisted the trier of fact in determining whether appellees' conclusions regarding Gesin's risk of suicide were accurate.

Davis' opinion regarding the reasonable foreseeability of Gesin's suicide cannot be characterized as an opinion as to how the court should decide the case. For example, Davis did not offer the ultimate legal conclusion as to whether appellees were liable for Gesin's death. As Reiber pointed out in her relevance objection, Davis did not offer testimony regarding the standard of care to be applied to a jailer. Rather, Davis offered the court a comparative point of view based on the more specialized and higher standard of care applicable to a psychiatrist. Reiber had a full opportunity to cross-examine Davis and argue to the court that it should not be persuaded by Davis' testimony. As indicated, the court specifically found in its posttrial order that "Davis' testimony was credible, relevant, and helpful." We find the court did not abuse its discretion in admitting Davis' testimony.

## Claim Barred Under § 13-910(1)

[9] The PSTCA reflects a limited waiver of governmental immunity and prescribes the exclusive procedure for

---

[29] *Id.*

[30] See *id.*

maintenance of a tort claim against a political subdivision or its officers, agents, or employees.[31] Gage County is a political subdivision of the State of Nebraska.[32] The Gage County sheriff is an officer of Gage County.[33] Where an officer or employee of a political subdivision is sued in his or her individual capacity, but is acting within the scope of his or her employment as a government official, the PSTCA applies, and the individual is immune unless the State has expressly waived its sovereign immunity.[34]

[10] The PSTCA eliminates, in part, the traditional immunity of political subdivisions for the negligent acts of their employees.[35] Except as otherwise provided, in all suits brought under the PSTCA, "the political subdivision shall be liable in the same manner and to the same extent as a private individual under like circumstances."[36]

[11] However, § 13-910(1) provides that political subdivisions are immune from suit under the PSTCA for actions based upon the acts or omissions of an employee exercising due care in the execution of a rule or regulation. If a claim comes within the exemption under § 13-910(1), then the claim is barred by sovereign immunity and the political subdivision, officer, or employee cannot be liable. A suit that is barred by sovereign immunity is dismissed for lack of subject matter jurisdiction.[37]

[12,13] Statutes that purport to waive the protection of sovereign immunity of the State or its subdivisions are strictly construed in favor of the sovereign and against the

---

[31] § 13-902; *Geddes v. York County*, 273 Neb. 271, 729 N.W.2d 661 (2007).

[32] § 13-903(1).

[33] See *Koepf v. York County*, 198 Neb. 67, 251 N.W.2d 866 (1977).

[34] See *Davis v. State*, 297 Neb. 955, 902 N.W.2d 165 (2017).

[35] *Doe v. Omaha Pub. Sch. Dist.*, 273 Neb. 79, 727 N.W.2d 447 (2007).

[36] § 13-908.

[37] See, *Amend v. Nebraska Pub. Serv. Comm.*, 298 Neb. 617, 905 N.W.2d 551 (2018); *Davis, supra* note 34.

waiver.[38] In order to strictly construe the PSTCA against a waiver of sovereign immunity, we broadly read exemptions from a waiver of sovereign immunity.[39] Section 13-910(1) is clear and unambiguous. Accordingly, the issue is whether Reiber's negligence claim falls within § 13-910(1).

Following a trial on the issue of liability, the district court concluded that "Gesin's death was not reasonably foreseeable . . . and the jailers were acting with due care." The court found that Reiber failed to prove appellees did anything beyond exercising due care in carrying out jail rules and regulations. The jail rules and regulations referred to by the trial court are regulations established by the Jail Standards Board and which are promulgated pursuant to statute.[40] Under Neb. Rev. Stat. § 83-4,126(1) (Reissue 2014), the Jail Standards Board shall have the following authority and responsibility:

> (a) To develop minimum standards for the construction, maintenance, and operation of criminal detention facilities [and]
> (b) To perform other duties as may be necessary to carry out the policy of the state regarding criminal detention facilities, juvenile detention facilities, and staff secure juvenile facilities as stated in sections 83-4,124 to 83-4,134.01[.]

The trial court cited to "the rules of the Jail Standards Board" discussed at trial regarding the jail's responsibility to screen inmates for the need for mental health attention,[41] the risk of serious harm to themselves or another person,[42] or the need to place an inmate in a safety cell.[43] The court found that

---

[38] *Patterson v. Metropolitan Util. Dist.*, 302 Neb. 442, 923 N.W.2d 717 (2019).

[39] *Stick v. City of Omaha*, 289 Neb. 752, 857 N.W.2d 561 (2015).

[40] Neb. Rev. Stat. § 83-4,124 (Reissue 2014).

[41] 81 Neb. Admin. Code, ch. 4, § 002.07 (2012).

[42] 81 Neb. Admin. Code, ch. 4, § 002.01B (2012).

[43] 81 Neb. Admin. Code, ch. 5, § 003.01C (2014).

Reiber failed to prove appellees did anything beyond exercising due care in carrying out jail rules and regulations.

We agree that the record shows that standard procedures designed to detect an inmate's suicide risk were followed. Trantham, the arresting officer, informed the jail staff of the prior stabbing incident, completed a custody authorization form, did not observe any indication that Gesin might engage in self-harming behavior, and did not believe Gesin to be a suicide risk. Maloley, who placed Gesin in EPC in 2011, did not consider Gesin to be a suicide risk and did not think that an EPC was necessary. Gesin was angry and agitated when he arrived at the jail, but calmed during the booking process. Although Gesin had a blood alcohol level of .103, he was not significantly inebriated, as there was no slurring of speech; his thought process was clear; and he was easily able to answer questions about his Social Security number, place of birth, mother's maiden name, and telephone number. The booking video showed that Gesin exhibited forward-thinking behavior and was focused on posting bail. The jail staff completed a medical questionnaire and asked Gesin whether he had ever attempted suicide and whether he was presently having suicidal thoughts, and Gesin verbally responded in the negative. Lock, who had received training in suicide prevention, testified that Gesin presented as a normal arrestee and saw no reason to place him on suicide watch. Reiber spoke with Gesin minutes before his suicide, and she testified that she did not think that he was suicidal. Davis testified that even he would not have foreseen the suicide. The greater weight of the evidence in the record therefore supports the district court's finding that appellees exercised due care in following jail rules and regulations in order to detect the risk of an inmate's suicidal behavior.

The jail staff followed its policy to place an intoxicated inmate alone in a safety cell. The officers began exercising the precaution of making frequent cell checks on Gesin. Gesin was placed in his cell at 6:05 p.m., West conducted the first cell

check at 6:15 p.m., and Lock heard Gesin using the telephone about 5 minutes later. The next check was conducted at 6:45 p.m., at which time Lock discovered that Gesin was hanging himself. Reiber's claim relies on hindsight and speculation rather than on the information actually known by the jailers. However, we agree with the district court that the evidence showed that under the circumstances, Gesin did not present a known or reasonably foreseeable suicide risk and appellees exercised due care. Reiber offered no expert testimony to establish the foreseeable risk of suicide or lack of due care exercised by appellees. Reading § 13-910(1) broadly, as we must, we conclude that Reiber's claim is based on acts or omissions of appellees exercising due care in the execution of a rule or regulation.

The court did not err when it concluded that Reiber's claim for money damages was barred under § 13-910(1) and that appellees were entitled to judgment in their favor. Because we conclude that appellees are immune from Reiber's claim, we need not consider Reiber's assignment of error regarding the district court's alternative conclusion in favor of appellees on the merits of Reiber's negligence claim.

## CONCLUSION

We agree with the district court that Reiber's claim was barred under § 13-910(1). As a result, we affirm the district court's determination that it lacked subject matter jurisdiction over Reiber's claim and that appellees are entitled to judgment in their favor.

Affirmed.