Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
01/12/2021 08:07 AM CST

Richard Walters, appellant, v.
Scott Frakes et al., appellees.

___ N.W.2d ___

Filed January 5, 2021.    No. A-19-532.

1. **Judgments: Appeal and Error.** In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict and will not be disturbed on appeal unless clearly wrong.

2. **____: ____.** In reviewing a judgment awarded in a bench trial of a law action, an appellate court does not reweigh evidence, but considers the evidence in the light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence.

3. **Jurisdiction: Appeal and Error.** Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it.

4. **Jurisdiction: Words and Phrases.** Subject matter jurisdiction is the power of a tribunal to hear and determine a case in the general class or category to which the proceedings in question belong and to deal with the general subject matter involved.

5. **Jurisdiction.** Parties cannot confer subject matter jurisdiction upon a judicial tribunal by either acquiescence or consent, nor may subject matter jurisdiction be created by waiver, estoppel, consent, or conduct of the parties.

6. **Actions: Jurisdiction.** Lack of subject matter jurisdiction may be raised at any time by any party or by the court sua sponte.

7. **____: ____.** A court action taken without subject matter jurisdiction is void.

8. **Tort Claims Act: Immunity: Waiver: Appeal and Error.** An exception to the State's waiver of immunity under the State Tort Claims Act is an issue that the State may raise for the first time on appeal and that an appellate court may consider sua sponte.

9. **Tort Claims Act: Appeal and Error.** An appellate court has the power to determine whether a plaintiff's allegations, taken as true, show

that a tort claim is facially barred by a State Court Claims Act exception under Neb. Rev. Stat. § 81-8,219 (Reissue 2014).

10. **Tort Claims Act.** In determining whether the discretionary function exception to the State Tort Claims Act applies, a court engages in a two-step analysis. First, the court considers whether the action is a matter of choice for an acting employer. If the court concludes that the challenged conduct involves an element of judgment, it must then determine whether the judgment is of a kind that the discretionary function was designed to shield.

11. ____. The discretionary function exception extends only to basic policy decisions made in governmental activity and not to ministerial activities implementing such policy decisions.

12. **Negligence: Proof.** In order to recover in a negligence action, a plaintiff must show a legal duty owed by the defendant to the plaintiff, a breach of such duty, causation, and damages.

13. **Trial: Evidence: Appeal and Error.** An appellate court will consider the fact that the trial court saw and heard the witnesses and observed their demeanor and, therefore, will give great weight to the trial court's judgment regarding credibility.

Appeal from the District Court for Lancaster County: ROBERT R. OTTE, Judge. Affirmed.

F. Matthew Aerni, of Berry Law Firm, for appellant.

Douglas J. Peterson, Attorney General, and James D. Smith for appellees.

PIRTLE, BISHOP, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Richard Walters, an inmate at the Nebraska Department of Correctional Services (DCS), sued Scott Frakes, the director of DCS; DCS; and John Does 1 through 99 (collectively referred to as "the Appellees"), for alleged negligent failure to respond to his medical complaints and condition which resulted in permanent injury to him. The district court ruled in favor of the Appellees, finding there was no breach of duty in connection with Walters' claim. We affirm.

## II. STATEMENT OF FACTS

On July 8, 2015, Walters was an inmate at the Nebraska State Penitentiary when, at approximately 10:30 a.m., he complained to a staff member assigned to his floor regarding a medical problem that Walters was experiencing. At trial, Walters described his first attempt to report his condition as follows: "I seen them. I told them — I never had it before and so I say I got groin issues (indicating), something, it ain't going away, it's hurting." In connection with his grievance, Walters acknowledged he pointed in the direction of his groin, but never specifically indicated that the medical issue he was experiencing had to do with an erection or his penis. Walters testified that the staff member told him he would contact medical personnel, but no medical personnel responded.

Walters testified he notified a different staff member about his medical issue nearly 8 hours later at about 7 p.m. During trial, the following colloquy occurred between Walters and his counsel regarding his second report:

Q. So around 7 o'clock someone is coming around with medications and you're able to catch this person and you're able to tell them about your problem?

A. Yes.

Q. . . . .

When you're telling this person about your problem, did you use the word erection?

A. No.

Q. Did you use any slang?

A. No.

Q. Okay. I presume you did not use the word priapism?

A. No. I didn't know what that was.

Q. Didn't even know what that was until later on, right?

A. Way later.

Q. Yeah. When that second person was coming around and you're telling them about your problem, I understand you did not use those specific words we just talked about?

A. No.

Q. What did you do to let this person know that you had a problem with your penis and you'd had it since, give or take, 8 in the morning?

A. I said — because I had seen him before, I seen the CO before, and he usually worked 6 to 2 on the first shift. He did half an extra shift because we were short-handed, we had been short-handed. So he came up, he had [a] med card, the other CO didn't have a med card. You have to have a med card to pass out meds. I was familiar with him. I had seen the CO a few times on the yard.

. . . .

A. I was just a little more comfortable, I didn't want to — there's inmates around, he's passing out meds, he's doing supplies. So, I mean, I got a problem down here (indicating), it's been like that since about 8 o'clock this morning and it won't go away. And, man, can you please call medical.

. . . .

Q. When you told him you had a problem . . . since 8 a.m., did you gesture towards your groin?

A. Yeah (indicating).

Q. And you're kind of doing that now?

A. I was trying to be [discreet] about it because . . . he's at my door. He opens two doors at a time, two to three doors, like, two doors and two doors across from each other, the hallway. So I'm trying to talk to him and be [discreet] and letting him know. He says, oh, I'll say something, I'll call medical, see what I can do.

Again, no one responded.

Walters then testified that, at approximately 10 p.m., he notified a third shift operator that he was experiencing groin pain and again pointed in the direction of his groin without further explanation. Walters explained he did not want to further elaborate on the specific nature of the condition because of his embarrassment and desire to remain discreet because of the presence of other inmates. Although the staff person indicated he would inform medical staff, no medical

personnel immediately responded. Walters then testified he could not sleep because of the pain associated with the condition, and he did not have another opportunity to report his condition until the following day at 4 a.m.

On July 9, 2015, at 4 a.m., Walters reported that the staff person to whom he last reported his condition at 10 p.m. came around and Walters asked what happened in connection with his prior report. According to Walters, that staff person indicated that he called medical staff but that they had not yet responded because Walters' condition was not a serious issue. In response, Walters stated he disagreed in that his condition had been ongoing since 8 a.m. the previous day with no relief. At that point, Walters stated that he might have indicated the condition had to do with an erection, but he was unsure. He then pressed the staff person as to why he waited so long to come back. In response, Walters stated the staff person indicated Walters would have to "wait till rounds." At 6:30 a.m., when the inmates came out for breakfast, Walters reported that a caseworker with whom he was familiar was working. Walters indicated that the caseworker asked him why he was walking funny and that Walters, who had greater familiarity with the caseworker, more explicitly described the nature of his medical issue which was that he had a constant, painful erection since the previous day. As a result of this report, and in connection with what Walters described as the normal rounds for a nurse to see inmates between 7 and 9 a.m., Walters was finally attended to by the nurse. Walters reported that after examining Walters, the nurse reacted immediately and arranged for Walters to be transported to see a doctor. Walters stated that while he was in the doctor's office, the attendants described his situation as an emergency, and he was taken to the hospital, was the recipient of emergency surgery, and eventually suffered through a painful recovery.

The district court noted in its order:

> Walters was diagnosed with priapism. Priapism is a prolonged (and/or spontaneous) erection of the penis that

lasts for more than four hours. Left untreated, priapism can cause permanent erectile dysfunction. If priapism is treated within a four to six-hour window after initial erection, there is a greater likelihood of a full recovery. Even if priapism is treated within a four to six-hour window, there is still a chance that permanent damage will be done. After that four to six-hour window, the chances for a full recovery decrease and a greater chance exists that permanent erectile dysfunction will result.

The court finds that . . . Walters will likely experience permanent damages as a result of his priapism and treatment.

The first written evidence governing Walters' report appears in a medical chart received into evidence as exhibit 7. That chart indicates that at 4:10 a.m. on July 9, 2015, the staff member to whom Walters reported his medical issue notified the night shift medical nurse about Walters' report. That nurse indicated that Walters had reported "groin pain" and that, after conducting a medical chart review, "groin pain" did not constitute a medical emergency. The entry on the chart indicated the staff member was instructed to let the inmate know that the nurse would be around in the morning and that Walters could have his issue addressed at that time.

On cross-examination, Walters testified to his familiarity with sending written emergency grievances and agreed he did not initiate either based upon his prior experiences of response time in connection with such process. But Walters also identified a prior incident where he notified penitentiary staff that he had chest pains which resulted in an immediate medical response.

During his case in chief, Walters offered the videotaped deposition of Dr. Robert Rhodes, a board-certified family physician in Lincoln, Nebraska. During cross-examination, as it related to Walters' report of symptoms, the following colloquy ensued:

Q. And if a patient told you that he had groin pain, or if a patient had called you and told you that he had groin pain, would you tell him to go to the emergency room?

A. I might ask more questions. But I don't think that just with the term "groin pain" I would send someone to the ER.

On redirect, the issue was readdressed by Walters' counsel as follows:

Q. [State's counsel] asked some questions about groin pain or, . . . if a patient, you know, contacts you.

So, hypothetically, if I were your patient and I contacted you, said, "Dr. Rhodes, I have some groin pain today, what should I do," you said that you might ask some more questions.

Were you kind of downplaying your role there when you say "might[?"]

A. Well, I would. I would think, you know, is it muscular, like they were playing basketball and they have a pulled groin, or could there be something else going on neurologically, testicular erection, burning with urination, discharge.

It kind of falls into that area of the body where — when someone says something is wrong down there, that's a whole big bucket for me to start to kind of ask what's wrong down there.

And groin pain might be included in . . . that area.

After reviewing this evidence, the district court ultimately held:

Walters had numerous opportunities that day to disclose his condition to various staff, to send an inmate interview request to medical, or to file an emergency medical grievance. . . . Walters knew how to submit an inmate interview request to medical and how to file an emergency medical grievance. . . . Walters could have either verbally informed staff of his condition or written it down if he didn't want to be heard by other inmates.

In summary, . . . Walters had a serious medical con-
dition. He failed to convey that condition to [DCS]
staff despite having numerous opportunities to do so.
He has not met his burden of proof accordingly and his
Complaint should be dismissed.

Walters now appeals from the order of dismissal.

### III. ASSIGNMENT OF ERROR

Walters contends that the district court was clearly wrong in
holding that the Appellees did not breach their duty to provide
medical care to him.

### IV. STANDARD OF REVIEW

[1,2] In a bench trial of a law action, the trial court's factual
findings have the effect of a jury verdict and will not be dis-
turbed on appeal unless clearly wrong. *Bloedorn Lumber Co.
v. Nielson*, 300 Neb. 722, 915 N.W.2d 786 (2018). In review-
ing a judgment awarded in a bench trial of a law action, an
appellate court does not reweigh evidence, but considers the
evidence in the light most favorable to the successful party and
resolves evidentiary conflicts in favor of the successful party,
who is entitled to every reasonable inference deducible from
the evidence. *Id*.

### V. ANALYSIS

#### 1. Jurisdiction

[3-7] Before reaching the legal issues presented for review,
it is the duty of an appellate court to determine whether it has
jurisdiction over the matter before it. *Gem City Bone & Joint v.
Meister*, 306 Neb. 710, 947 N.W.2d 302 (2020).

Subject matter jurisdiction is the power of a tribunal to
hear and determine a case in the general class or category
to which the proceedings in question belong and to deal
with the general subject matter involved. Parties cannot
confer subject matter jurisdiction upon a judicial tribunal
by either acquiescence or consent, nor may subject mat-
ter jurisdiction be created by waiver, estoppel, consent, or

conduct of the parties. Lack of subject matter jurisdiction may be raised at any time by any party or by the court sua sponte. A court action taken without subject matter jurisdiction is void.

*In re Estate of Evertson*, 295 Neb. 301, 307, 889 N.W.2d 73, 79 (2016).

In response to this court's request at oral arguments for supplemental briefing on possible jurisdictional issues, the Appellees argue that Walters' claim, as pled, was that

prison staff breached their duty to provide him with medical care by failing to provide the "care, skill, and knowledge ordinarily possessed and used under like circumstances *by other corrections departments engaged in similar care of similar inmates* when they failed to" "immediately inform[,"] "immediately contact[,"] and "accurately present [Walters'] complaint" to "prison medical staff[."]

Supplemental brief for appellees at 4 (emphasis in original).

The Appellees also suggest in their supplemental brief that Walters removed his claim from the general waiver of tort immunity under the State Tort Claims Act (STCA). Specifically, the Appellees argue that as pled, the claim violates the general waiver provision found in Neb. Rev. Stat. § 81-8,215 (Reissue 2014) and the discretionary function exception to the general waiver of immunity found in Neb. Rev. Stat. § 81-8,219(1) (Reissue 2014). We will discuss these arguments independently.

(a) Application of § 81-8,215

[8,9] The Appellees first argue that they did not consent to be sued under the specific circumstances pled by Walters, due to an exception to the general waiver of tort immunity contained within § 81-8,215. Although the Appellees did not affirmatively allege they were immune from suit under the STCA, the Nebraska Supreme Court recently held in *Davis v. State*, 297 Neb. 955, 979-80, 902 N.W.2d 165, 186 (2017), as follows:

We conclude that our cases holding that the State must plead and prove an exception to the STCA are clearly erroneous to the extent they can be read to hold that a state attorney waives an immunity defense under § 81-8,219 by failing to raise it in a pleading or to a trial court. To the extent that they can be so interpreted, the cases cited in footnotes 28 and 31 are overruled. We hold that an exception to the State's waiver of immunity under the STCA is an issue that the State may raise for the first time on appeal and that a court may consider sua sponte.

This holding does not mean that the State may litigate factual disputes relevant to the application of an STCA exception for the first time on appeal. But an appellate court has the power to determine whether a plaintiff's allegations, taken as true, show that a tort claim is facially barred by an STCA exception under § 81-8,219.

As in *Davis*, we now turn to the allegation in Walters' complaint as it relates to the Appellees' first contention.

The basic construct of the STCA was laid out by the Nebraska Supreme Court in *Davis*. There, the court explained:

Section 81-8,209 of the STCA bars tort claims against the State, its agencies, and its employees unless the State has waived its immunity for the claim: "The State of Nebraska shall not be liable for the torts of its officers, agents, or employees, and no suit shall be maintained against the state, any state agency, or any employee of the state on any tort claim except to the extent, and only to the extent, provided by the [STCA]."

Section 81-8,215 is the State's general waiver of tort immunity under the STCA. In relevant part, it provides that the State "shall be liable in the same manner and to the same extent as a private individual under like circumstances."

*Davis v. State*, 297 Neb. at 969, 902 N.W.2d at 180.

Applying those principles to the case at bar, the Appellees argue:

The "heart" of Walters' complaint was inadequate communication by guards and prison staffers to the medical staff, not the care actually provided by the medical staff. Unlike a situation involving private individuals, Walters was in a prison with corresponding security requirements. When Walters chose to allege his tort claim in the context of what prison staff and guards should and should not do when communicating with medical staff, he necessarily removed his claim from Section 81-8,215's limitation of the State "shall be liable in the same manner and to the same extent as a private individual under like circumstances[."] Because, per *Davis*, the "state defendants could not have committed the tortious acts set out in [Walters'] complaint as private individuals[,"] Walters alleged a state tort claim complaint that was jurisdictionally barred by sovereign immunity. Private individuals don't have or need prison guards to communicate with medical staff.

Supplemental brief for appellees at 4-5.

Indeed, the Nebraska Supreme Court did find in *Davis* that employees of the Nebraska Board of Parole and DCS had no parallel function as private individuals in relation to calculating an inmate's mandatory minimum sentence on behalf of their State employer. But can the same be said with regard to the role of prison guards in reporting the medical complaints of inmates?

Because we find no direct Nebraska Supreme Court precedent on this specific issue, we now look to U.S. Supreme Court precedent governing the Federal Tort Claims Act (FTCA) to inform our reading of Nebraska statutes patterned after federal legislation. See *Jill B. & Travis B. v. State*, 297 Neb. 57, 899 N.W.2d 241 (2017). The U.S. Supreme Court found that a similar "private individual" exception to the general waiver of federal tort liability in the FTCA did not apply to a similar factual scenario in *United States v. Muniz*, 374 U.S. 150, 83 S. Ct. 1850, 10 L. Ed. 2d 805 (1963). In *Muniz*, the Court reviewed separate claims in which prison guards

were alleged to have failed to protect inmates which resulted in personal injury. One such claim involved an inmate confined to a U.S. penitentiary in Indiana. The inmate originally complained of symptoms that included dizziness, loss of balance, and difficulty with vision. He was originally diagnosed, and treated for, hypertension, but his symptoms increased in severity. Despite repeated complaints to prison officials, the inmate was given no further treatment. The inmate's attorney eventually became alarmed by his client's symptoms and had him separately examined by a consulting physician. That examination resulted in the discovery of a benign brain tumor. The inmate eventually received surgery which successfully removed the tumor, but the inmate lost his sight. The inmate eventually sued the government and alleged that the negligence of the government's prison employees in not reporting his complaints resulted in the delay in diagnosis and caused his blindness.

The government alleged the inmate was not entitled to maintain the suit in negligence, due, in part, to the provisions of a federal statute. That statute gave the district court jurisdiction

> "'of civil actions on claims against the United States, for money damages, . . . for . . . personal injury . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.' 28 U.S.C. § 1346(b)."

*Muniz*, 374 U.S. at 152. The FTCA further provides that the "'United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances.' 28 U.S.C. § 2674." *Muniz*, 374 U.S. at 153. The government argued, like the Appellees do here, that the prison employees'

conduct had no parallel in function to private individuals and that, pursuant to the FTCA, the government did not consent to be sued for a claim of this nature. In response, the U.S. Supreme Court framed the issue as "[w]hether a claim could be made out would depend upon whether a private individual under like circumstances would be liable under state law, but prisoners are at least not prohibited from suing." *Muniz*, 374 U.S. at 153.

After reviewing the legislative history of the FTCA, the Court first concluded that Congress intended to permit such suits. The Court held that "[f]or a number of reasons, it appears that Congress was well aware of claims by federal prisoners and that its failure to exclude them from the provisions of the [FTCA] in 28 U. S. C. § 2680 was deliberate." *United States v. Muniz*, 374 U.S. 150, 153-54, 83 S. Ct. 1850, 10 L. Ed. 2d 805 (1963). Further, in relation to the government's argument that there was "the absence of an analogous or parallel liability, on the part of either an individual or a State," *id.*, 374 U.S. at 159 (principle reason previously cited by U.S. Supreme Court in *Feres v. United States*, 340 U.S. 135, 71 S. Ct. 153, 95 L. Ed. 152 (1950), for not allowing suit under FTCA), the *Muniz* Court held, "And in any event, an analogous form of liability exists. A number of States have allowed prisoners to recover from their jailers for negligently caused injuries and several States have allowed such recovery against themselves," 374 U.S. at 159-60. After further refuting the government's arguments, the *Muniz* Court ultimately held:

> The [FTCA] provides much-needed relief to those suffering injury from the negligence of government employees. We should not, at the same time that state courts are striving to mitigate the hardships caused by sovereign immunity, narrow the remedies provided by Congress. As we said in *Rayonier, Inc., v. United States*[, 352 U.S. 315,] 320, [77 S. Ct. 374, 1 L. Ed. 2d 354 (1957),] "There is no justification for this Court to read exemptions into the [FTCA] beyond those provided by Congress. If the

[FTCA] is to be altered that is a function for the same body that adopted it."
374 U.S. at 165-66.

The Nebraska Supreme Court has long recognized that the STCA is patterned after the FTCA. *Johnson v. State*, 270 Neb. 316, 700 N.W.2d 620 (2005). Based upon the similarity between the language of the aforementioned provisions of the FTCA and § 81-8,215 of the STCA, and the U.S. Supreme Court's guidance as it relates to facts similar to the case at bar, we hold that the duty of care of the DCS' prison guards in connection with the reporting of medical complaints by inmates as pled in this case did not facially violate the exception to the general waiver of state tort liability found in § 81-8,215.

### (b) Application of § 81-8,219(1)

The Appellees next argue that the prison guards' duty here is also excepted from the general waiver of state tort liability under § 81-8,219(1). Again, although this was not raised as an affirmative defense, and although the Appellees may not litigate factual disputes relevant to the application of the STCA for the first time on appeal, our court may determine whether Walters' allegations, taken as true, show that his tort claim is facially barred by an STCA exception under § 81-8,219. See *Davis v. State*, 297 Neb. 955, 902 N.W.2d 165 (2017).

As previously stated in this opinion, the Appellees assert that Walters alleged the DCS' prison guards breached their duty of "'care, skill, and knowledge ordinarily possessed and used under like circumstances by other corrections departments engaged in similar care of similar inmates'" when they failed to "'immediately inform,'" "'immediately contact,'" and "'accurately present [his] complaint' to 'prison medical staff.'" Supplemental brief for Appellees at 4 (emphasis omitted). The Appellees argue that the heart of Walters' complaint was inadequate communication by prison guards and staffers to the medical staff. We agree with this summation of Walters' complaint.

In connection therewith, the Appellees argue that Walters' articulation of the prison guards' duty here sets forth the wrong standard of care. In connection with that proposition of law, the Appellees argue the proper standard of care is contained within the provisions of the Nebraska Correctional Health Care Services Act (NCHCSA). Specifically, the Appellees cite to Neb. Rev. Stat. § 83-4,155 (Reissue 2014) of the NCHCSA, which provides: "In administering health care services, the department shall provide a community standard of health care to all inmates." "Community standard" is defined as "medical care of the type, quality, and amount that any individual residing within the community in question could expect to receive in that community." Neb. Rev. Stat. § 83-4,154(1) (Reissue 2014). Finally, the Appellees direct us to Neb. Rev. Stat. § 83-4,157 (Reissue 2014) of the NCHCSA that outlines the DCS medical director's duties under the NCHCSA, which include the following responsibilities:

> (6) Develop and implement condition-specific medical treatment protocols that ensure compatibility with a community standard of health care, including protocols addressing the: (a) Treatment of gastrointestinal bleeds; (b) detection and treatment of all communicable diseases; (c) treatment of gender-specific problems; (d) treatment of diabetes; (e) treatment of hypertension; (f) treatment of headaches; (g) utilization of surgical procedures; (h) control of infection; (i) provision of dental care; (j) provision of age-specific and gender-specific routine health maintenance; (k) means by which inmates obtain access to health care services; (l) use of prescribed drugs, devices, or biologicals for the purpose of pain management; (m) referral of patients to medical specialists not in the employ of the department; and (n) initiation, observance, and termination of do not resuscitate orders initiated pursuant to the Rights of the Terminally Ill Act.

(Section 83-4,157 was amended effective July 19, 2018, but because the amendment took place after the relevant dates in this case, the amendment does not apply to this appeal.)

The Appellees then argue that "Walters' complaint did not allege that his health care or medical care breached the community standard of health care" and that "[a]ssuming for the sake of argument that a breach of the community standard of health care is a claim covered by the STCA, Walters did not allege such a breach of duty for his tort claim" which failure results in Walters' not stating a cognizable claim against the Appellees over which this court has jurisdiction. Supplemental brief for appellees at 5. The Appellees then argue that the prison guards' specific duties here are a product of the medical director's protocols to be developed under § 83-4,157(6), that such duties are subject to the discretionary function exception found in § 81-8,219(1), and that the district court and this court lack jurisdiction over the prison guards' conduct in this particular case as pled.

The Appellees' argument requires us to first examine the proper standard of care associated with the prison guards' acts or omissions in this particular case. The Appellees argue that the prison guards' duties here are prescribed by § 83-4,155 of the NCHCSA, that is, that the guards were required to provide a "community standard of health care" in administering health care services to Walters and that Walters failed to plead or define that "community standard" in his pleading or at trial. We disagree with the Appellees' contention the prison guards' duty here is prescribed by § 83-4,155. Section 83-4,155 prescribes a duty of care for "administering health care services." The prison guards are not health care providers and can better be described in the prison system as being involved in the process of ensuring inmates receive "health care services" once requested. In that regard, although we agree with the Appellees' contention that "[t]he 'heart' of Walters' complaint was inadequate communication by guards and prison staffers to the medical staff," supplemental brief for Appellees at 4, we recognize that those prison guards and staffers are not medically trained personnel. As such, it would make little sense to define their duties within that process as

fitting within a "community standard of health care" under § 83-4,155. Instead, we believe the prison guards' and staffers' duties to communicate here, as part of the process of ensuring inmates obtain access to medical care, is better described by the Nebraska Supreme Court's holding in *Reiber v. County of Gage*, 303 Neb. 325, 928 N.W.2d 916 (2019). In that case, which involved a claim by the estate of a deceased inmate against the county for its jail guards' alleged failure to protect an inmate from suicide, the court held:

> The threshold issue in any negligence action is whether the defendant owes a legal duty to the plaintiff. Here, the parties do not dispute that prison officials owe inmates a legal duty, and we agree. In *Goodenow v. State*, [259 Neb. 375, 381, 610 N.W.2d 19, 23 (2000),] we held that the standard of care by prison officials to inmates is as follows: "A jailer is required to exercise a degree of care necessary to provide reasonably adequate protection for his or her inmates." What constitutes "'reasonably adequate protection' . . . necessarily depends upon what correctional officers knew or should have known about a particular risk of injury before it occurred."

*Reiber*, 303 Neb. at 337, 928 N.W.2d at 926.

Because we hold that the standard of care announced in *Goodenow v. State*, 259 Neb. 375, 610 N.W.2d 19 (2000), is properly reflective of the standard of care owed by the prison guards to Walters in these circumstances, we disagree with the Appellees' contention that Walters failed to properly plead his claim against DCS by failing to articulate a "community standard" of care. In short, Walters alleged that the DCS' prison guards breached their duty by failing to immediately report his medical complaints to prison medical staff following his disclosures to them. That pleading properly captured DCS' duty here and created a fact issue for the trier of fact, which in this case resulted in the district court's determination that Walters failed to meet his burden of proof.

As it relates to the Appellees' other claim, that the medical director's protocols to be adopted under § 84-4,157(6) governing access to health care services are discretionary in nature and should preclude this suit under § 81-8,219(1), we cannot make that analysis or determination on this record. As we stated before, Walters properly pled a claim against DCS relating to the general standard of care owed by prison officials to inmates under these circumstances. If the medical director of DCS has, in fact, issued protocols under § 83-4,157(6)(k), which further define the prison guards' specific duties for reporting medical complaints, they were not offered by any party or made part of this record.

[10,11] In determining whether the discretionary function exception to the STCA applies, a court engages in a two-step analysis. First, the court considers whether the action is a matter of choice for an acting employer. If the court concludes that the challenged conduct involves an element of judgment, it must then determine whether the judgment is of a kind that the discretionary function was designed to shield. See *Holloway v. State*, 293 Neb. 12, 875 N.W.2d 435 (2016). The discretionary function exception extends only to basic policy decisions made in governmental activity and not to ministerial activities implementing such policy decisions. *Id*. It is obvious that without reviewing the medical director's specific protocols here, which were not made a part of our record, we are unable to determine whether the discretionary function exception applies. Under these circumstances, where this matter is being raised for the first time on appeal, and without a record as it relates to these alleged protocols which may further refine the prison guards' general duties here, we cannot say the district court or this court lacks jurisdiction over Walters' claim. On this record, this argument fails.

## 2. Sufficiency of Evidence

Walters brought this claim against the Appellees alleging that the Appellees were negligent in their failure to immediately

report his medical claim, which resulted in delayed medical care and permanent injury. Walters assigns that the trial court was clearly wrong in holding that the DCS' prison guards and staffers did not breach their duty to provide medical care to him.

[12] In order to recover in a negligence action, a plaintiff must show a legal duty owed by the defendant to the plaintiff, a breach of such duty, causation, and damages. *Hodson v. Taylor*, 290 Neb. 348, 860 N.W.2d 162 (2015).

Here, Walters specifically alleged in his complaint that the government "had an obligation/duty to provide medical care for [Walters]" and that the government breached that duty by failing to inform medical staff of Walters' nondissipating erection following his disclosures at 10 a.m. and 7 p.m. on July 8, 2015, and his disclosure the following morning at 4:10 a.m.

As we previously noted in this opinion, the prison guards' general duty here was properly articulated by the Nebraska Supreme Court in *Reiber v. County of Gage*, 303 Neb. 325, 337, 928 N.W.2d 916, 926 (2019), wherein the court held:

> In *Goodenow v. State*, [259 Neb. 375, 381, 610 N.W.2d 19, 23 (2000),] we held that the standard of care by prison officials to inmates is as follows: "A jailer is required to exercise a degree of care necessary to provide reasonably adequate protection for his or her inmates." What constitutes "'reasonably adequate protection' . . . necessarily depends upon what correctional officers knew or should have known about a particular risk of injury before it occurred."

As it relates to this duty and application of the facts here, the district court stated:

> Through the course of . . . Walters' testimony, the court observed his communication skills, demeanor, physical expression, language skills, and overall communication skills. The ability to express oneself and willingness to express conditions and circumstances is critical to the decision in this case. In observing . . . Walters' voice,

actions, and descriptions of how he described his interactions with [DCS] staff, it is clear that he was not communicating effectively. His body mechanics, the words used, and the references he made to try and explain his severe medical problem just simply were not enough to convey his critical needs. During his testimony at trial, those mannerisms, expressions, body movements, and descriptive words were difficult to understand. . . . Walters freely admits that he was not willing to openly discuss his medical problems with [DCS] staff. He used obtuse references and gestures rather than . . . direct and clear descriptions. He never told [DCS] staff that he was having an emergency. He never said that he had an erection that had lasted over the course of hours. His use of "down there," "groin pain," or pointing toward his groin while making facial expressions, as he did during trial, does little to convey the nature and extent of the need much less the urgency.

[13] In this case, neither party disputes that prison guards and staffers have a duty to disclose medical complaints to prison medical staff. Nor does anyone argue that the prison guards and staffers failed to make those disclosures. The issue here was based solely on the timing of those disclosures to medical staff (i.e., approximately 21 hours after Walters' original complaint). Thus, the specific question here is whether the delay in reporting Walters' complaints amounted to a breach of duty under the standard of care we articulated above. The standard of care stated in *Reiber* turns on what the """officers knew or should have known about the particular risk"""" involved here. 303 Neb. at 337, 928 N.W.2d at 926. Stated differently, the question is whether Walters' complaints were such that the prison officials should have known he was suffering from an urgent or emergency condition, which involved risk to Walters' health and required immediate medical attention. The question of whether Walters' communication of his condition was sufficient to apprise the Appellees of a medical

condition that involved a substantial risk to Walters' health and required more immediate reporting was a factual question for the trier of fact. That fact was decided by the district court in favor of the Appellees. In reviewing this finding, an appellate court does not reweigh the evidence but considers that finding in a light most favorable to the successful party, here the Appellees, and resolves evidentiary conflicts in its favor and provides the successful party with every reasonable inference deducible from the evidence. See *Reiber v. County of Gage, supra*. Further, an appellate court will consider the fact that the trial court saw and heard the witnesses and observed their demeanor and, therefore, will give great weight to the trial court's judgment regarding credibility. *Steinauer v. Sarpy County*, 217 Neb. 830, 353 N.W.2d 715 (1984). Applying that standard of review here, we cannot say that the district court was clearly wrong in its factual determinations.

Here, the medical condition which afflicted Walters is called priapism. The unrefuted testimony is that the condition consists of a protracted erection of the penis which, if left medically untreated within a period of 4 to 6 hours, may result in permanent injury to the penis. The record indicates that Walters appeared to have become afflicted with this condition on the morning of July 8, 2015. The record also reveals that Walters attempted to communicate with prison staff about the subject of his condition at approximately 10 a.m., 7 p.m., and 10 p.m. on July 8, and then again at 4 a.m. on July 9 before Walters received medical care. On July 8, during the three conversations in which Walters attempted to communicate his condition, Walters never stated that his medical problem involved an erection or his penis. Instead, Walters subtly referred to having pain associated with his "groin" and pointed in the general direction of his groin. After reviewing Walters' testimony and the specific evidence offered at trial, we hold the district court was not clearly wrong in finding that there was nothing about Walters' description of his medical condition which would lead the prison guards or staffers to know

or understand the specific nature of his condition or to infer it was an emergency and that they did not breach their duty of care by not reporting Walters' complaints to prison medical staff sooner.

In support of that finding, we agree with the district court that Walters' failures to openly and willingly discuss his specific medical condition and his obtuse references and gestures to "groin pain" and "down there" did little to convey the nature and extent of his condition, much less its urgency. We note that even Dr. Rhodes, whom Walters called as an expert to describe the nature of Walters' condition, testified that Walters' complaints of "groin pain" would not elicit an emergency response from him. Further, Walters acknowledged his understanding of the prison's grievance procedure that was available to him, which he could have utilized to more specifically or discretely disclose his situation as an emergency and which he opted not to utilize on this occasion. Finally, Walters testified to a different occasion where he experienced chest pains that he disclosed to prison staff in a more descriptive and urgent way, which resulted in an immediate medical response from the staff and medical care providers. Taken together, the testimony establishes that Walters was aware of the processes available to him to communicate a serious medical condition, that he formerly successfully utilized those processes in obtaining help, and that he simply failed to do so on this occasion. Notwithstanding his understanding of those processes, Walters opted not to descriptively communicate his medical condition here because, as Walters explained, he was embarrassed to do so in front of the other inmates, and he chose to discretely communicate the nature of his condition which became progressively more painful and serious until he was first administered to on the morning of July 9, 2015.

We hold that, based upon the record, the district court did not clearly err in finding that Walters' communications to the Appellees were not sufficient to place the Appellees on notice that Walters was suffering from a medical condition, which

involved an immediate and substantial risk to his health, and that the DCS' prison guards and staffers did not breach the applicable standard of care by not more immediately reporting Walters' complaints to prison medical staff.

## VI. CONCLUSION

In sum, for the reasons set forth herein, having determined that the district court did not err in dismissing Walters' complaint against the Appellees, we affirm the order of the district court.

Affirmed.